**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

Information Images LLC,                                   Case No. 6:20-CV-00268-ADA

      Plaintiff,

v.

PGA TOUR, Inc.,

      Defendant.

_____/

**Defendant PGA TOUR's Motion For**
**Summary Judgment Of Noninfringement**
**And Invalidity Under Sections 101 and 112**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................................ 1

II.     FACTS ............................................................................................................... 3

        A.     Plaintiff's Patents And The Claimed Invention ........................................ 3

        B.     PGA TOUR's ShotLink System ................................................................ 6

        C.     PGA TOUR's Agreement With IMG Arena ............................................... 7

        D.     The Accused Products And Alleged Damages From Infringement ........... 8

III.    SUMMARY JUDGMENT STANDARD ............................................................. 8

IV.     ARGUMENT ..................................................................................................... 9

        A.     PGA Tour's Fulfillment Of The IMG Arena Contract Is Noninfringing Because It Entirely Omits The Required Second Portable Device .......................... 9

        B.     The Asserted Claims Are Not Infringed Because It Is Third Party Golf Fans, Not PGA TOUR, That Own And Use The Required "Second Portable Device" ........ 12

        C.     PGA TOUR Does Not Infringe Because Its ShotLink System Does Not Include The Input Of The "Condition Of The Ball" .............................. 17

        D.     All The Asserted Claims Are Invalid Under 35 U.S.C. § 101 For Claiming The Abstract Idea Of Collecting, Processing, And Distributing Data Without A Technological Invention ................................................................... 23

        E.     The Claims Are Invalid For Failing To Meet The Written Description Requirement ................................................................................................ 31

V.      CONCLUSION ............................................................................................... 36

62236959;16

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                           **Page(s)**

*Acceleration Bay LLC v. 2K Sports, Inc.*,
    15 F.4th 1069 (Fed. Cir. 2021) ...................................................................................13, 14

*Akamai Technologies, Inc. v. Limelight Networks, Inc.*,
    797 F.3d 1020 (Fed. Cir. 2015) (*en banc*) .............................................................16

*Alice Corp. v. CLS Bank Int'l*,
    573 U.S. 208 (2014)..............................................................................23, 25, 26, 29

*BSG Tech LLC v. Buyseasons, Inc.*,
    899 F.3d 1281 (Fed. Cir. 2018).........................................................................26

*Centillion Data Systems LLC v. Qwest Communications International Inc.*,
    631 F.3d 1279 (Fed. Cir. 2011).....................................................................13, 14

*Electric Power Group, LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016)..................................................................... passim

*Flash-Control, LLC v. Intel Corp.*,
    No. 1:19-CV-01107-ADA, 2020 WL 4561591 (W.D. Tex. July 21, 2020),
    *aff'd*, No. 2020-2141, 2021 WL 2944592 (Fed. Cir. July 14, 2021)........................................8

*Gabriel de la Vega v. Microsoft Corp.*,
    Case No. W-19-CV-0612-ADA, (W.D. Tex. Feb 7, 2020)....................................16

*Gentry Gallery, Inc. v. Berkline Corp.*,
    134 F.3d 1473 (Fed. Cir. 1998).........................................................................32

*Heartbrand Holdings, Inc. v. Whitmer*,
    No. SA-19-CV-358-HJB, 2021 WL 1947875 (W.D. Tex. May 14, 2021) ............................8

*In re TLI Commc'ns Patent Litig.*,
    823 F.3d 607 (Fed. Cir. 2016)...........................................................................26

*Realtime Data, LLC v. Morgan Stanley*,
    554 F. App'x 923 (Fed. Cir. 2014) ....................................................................32

*RecogniCorp, LLC v. Nintendo Co.*,
    855 F.3d 1322 (Fed. Cir. 2017).........................................................................26

*Rothschild Location Techs. LLC v. Geotab USA, Inc.*,
    No. 6:15-cv00682 (E.D. Tex. May 16, 2016).......................................................29

*Rothschild Location Techs. LLC v. Geotab USA, Inc.*,
    No. 6:15-cv00682, Op. (E.D. Tex. Jan. 4, 2016)..................................18, 19, 29, 33

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
    930 F.3d 1295 (Fed. Cir. 2019) ........................................................................... 27

*Transperfect Glob., Inc. v. Matal*,
    703 F. App'x 953 (Fed. Cir. 2017) ...................................................................... 32

*Travel Sentry, Inc. v. Tropp*,
    877 F.3d 1370 (Fed. Cir. 2017) ........................................................................... 16

*USC IP P'ship, L.P. v. Facebook, Inc.*,
    6-20-CV-00555-ADA (W.D. Tex. Dec. 8, 2021) .................................................. 26

*USC IP P'ship, L.P. v. Facebook, Inc.*,
    Case No. 6-20-CV-00555-ADA (W.D. Tex. Dec. 8, 2021) .................................. 27

*Vasudevan Software v. MicroStrategy, Inc.*,
    782 F.3d 671 (Fed. Cir. 2015) ............................................................................. 32

**Statutes**

35 U.S.C. § 101 ............................................................................................. 23, 26, 29, 31

35 U.S.C. § 112 ¶ 1 .................................................................................................... 32

## I.      INTRODUCTION

Defendant PGA TOUR uses a system called ShotLink to collect and determine various types of information about golf shots during a golf tournament, such as the location of the ball after it has been hit. That ShotLink data is then used in a variety of ways. For example, it is sent to third parties who have licensed the data from PGA TOUR for their own use. The ShotLink data is also sent to a separate division at PGA TOUR that creates other software, such as TOURCast, that enables members of the public to view ShotLink data on their computers and phones through PGA TOUR's website and PGA TOUR's mobile app for smartphones.

The two asserted patents here claim a system and method with three primary components: (1) a "first portable device" used by an authorized spotter to input information about golf shots during a golf tournament; (2) a "production module" (essentially a server computer) that receives the input data over a wireless network, and (3) a "second portable device" carried by a patron of the tournament (referred to in the claims of the '552 patent as a "user viewing the tournament") to obtain that data over the wireless network from the production module and view it.

A notable requirement for the second (*i.e.*, patron's/user's) portable device that is found in all the asserted independent claims is that the device include endorsements of participants of the golf tournament by manufacturers of equipment used by the participants, such as an endorsement of a golfer by the manufacturer of the golf clubs he uses.

PGA TOUR is entitled to summary judgment of noninfringement for several reasons. First, PGA TOUR has licensed its ShotLink data to a third party, IMG Arena. PGA TOUR sends ShotLink data to IMG Arena in return for a fee. As a standalone component of its infringement damages, Plaintiff is seeking a portion of those fees. However, the creation of the ShotLink data and transmission of it to IMG Arena is noninfringing as a matter of law because there is no second

(patron's/user's) portable device used in connection with IMG Arena at all, let alone a second portable device with the required endorsement information.

Plaintiff also asserts that PGA TOUR infringes by the combination of PGA TOUR using its ShotLink data collection system (allegedly meeting the first portable device and production module limitations) with members of the public using their computers or phones to access the ShotLink data using PGA TOUR's website and mobile app (allegedly meeting the second portable device limitation). PGA TOUR is entitled to summary judgment on that alleged infringement too because the alleged first portable devices are used by PGA TOUR personnel, but the second portable devices are used by members of the public, not PGA TOUR -- a "divided infringement" problem.

Independently, PGA TOUR is entitled to summary judgment of noninfringement because all the claims require the spotter to input the "condition of the ball" as part of the input data. The Court has construed "condition of the ball" to mean the physical state of the ball, and the specification provides an example of the ball being "clean" or "dirty."  PGA TOUR's ShotLink system does not include any input of the condition of the ball.

PGA TOUR is also entitled to summary judgment on invalidity. The Federal Circuit has held that gathering, processing, and distributing data is not patentable subject matter unless it involves a technological innovation. There is no technological invention here. Instead, conventional components – commercially available handheld devices communicating over an ordinary wireless network with an ordinary computer server -- are being used in their expected manner to gather, process, and distribute data without any special hardware or other technological innovation.

Finally, several claim elements are not disclosed in the specification, running afoul of the written description requirement.

## II.    FACTS

### A.    Plaintiff's Patents And The Claimed Invention

Plaintiff is asserting Patent No. 9,806,832 (the "'832 patent") and its continuation, Patent No. 10,270,552 (the "'552 patent").  The perceived problem that the patents allegedly solve is that at "golf tournaments, it is difficult for spectators to get real-time information about the status [of] players who may be a great distance away from where the spectator is watching, or may not be visible at all."   Ex. 1, '832 patent at 1:26-30; Ex. 2, '552 patent at 1:28-30; Ex. 3, Valerdi Infringement Report ¶ 63.[1]  To address that problem, the patents disclose "systems and methods of gathering, processing, and broadcasting real-time information of the sporting event to portable devices carried by spectators of the sporting event." Ex. 1 at 1:41-45.  Consequently, the preambles of all four asserted independent claims (claims 1 and 5 of the '832 patent and claims 1 and 13 of the '552 patent) recite a system or method "of gathering, processing, and distributing information of a golf tournament over a wireless network." Ex. 1 at 15:19-20, 16:14-15; Ex. 2 at 15:20-21, 16:49-50.

Three significant components of the alleged invention are:

(1)  A portable device used by an authorized "spotter" to input data about the golf ball after it has been hit (the "gathering" of the information).  The claims refer to this device as the "first portable device."  Ex. 1 at claim 1.

---

[1] Unless otherwise indicated, citations to numbered exhibits are to the exhibits attached to the contemporaneously-filed Declaration of David Brafman in Support of PGA TOUR's Motion for Summary Judgment.

(2) A portable device used by patrons of the tournament to request and receive input data from the production module over the wireless network (the "distributing" of the information). The claims refer to this device as the "second portable device." *Id.* And

(3) A "production module" (essentially a back-end computer server which includes a "processing module") that receives the input data from the first portable device over a wireless network and distributes it in response to queries (the "processing" of the information). *Id.*

These three components and their communication of data over the wireless network are depicted in Figure 32:



Fig. 32

Ex. 1 at Fig. 32.

The first (spotter's) portable device, the second (patron's) portable device, and the production module with processing module are all required by each of the asserted independent claims.  For example, asserted claim 1 from the '823 patent states:

> 1. A system of **gathering, processing, and distributing information of a golf tournament over a wireless network**, comprising:
>
> [i.] a **first portable device** configured to be carried by a broadcast or other authorized **spotter** of the golf tournament …
>
> - the first portable device including a map of the golf course,
>
> - the first portable device being configured to **receive input data from the spotter** regarding status of a selected player's golf ball during the golf tournament in real time after the golf ball has been hit …
>
> - the first portable device being configured to present information regarding the **location and distance** of the selected player's ball relative to the map of the golf course in real time after the ball has been hit by the selected player,
>
> - the input data including information pertaining to the **lie and the condition of the golf ball** being tracked by the spotter and the selected player's strokes as they occur,
>
> - the first portable device being configured to **transmit the input data over the wireless network** in real time during the golf tournament;
>
> [ii.] a **second portable device carried by a patron of the golf tournament to receive transmitted input data over the wireless network**, and to selectively display current statistics pertaining to the selected hole and graphical representations of the transmitted input data according to an input from the patron, the second portable device comprising a **memory with pre-programmed information** stored therein, the pre-programmed information including **endorsements** of respective participants of the golf tournament by manufacturers of equipment used by the respective participants of the golf tournament; and
>
> [iii.] a **production module** configured to
>
> - receive transmitted input data over the wireless network simultaneously from a plurality of spotters covering various players of the golf tournament,
>
> - the production module being configured to **display transmitted input data such that the production module selectively distributes a portion of the transmitted input data to an external television network based on characteristics of displayed input data**,

- the production module having a processing module connected between the production module and the wireless network, the processing module configured

    - to **receive data requests** over the wireless network simultaneously from a plurality of second portable devices and

    - to **distribute requested data** to each second portable device over the wireless network based on received data requests from each second portable device, respectively.

Ex. 1 at 15:19-16:4 (formatting and emphases added). The remaining asserted independent claim from the '832 patent is claim 5, which is a corresponding method claim.  The asserted claims from the '552 patent, claims 1 and 13, are very similar to claims 1 and 5 of the '832 patent, respectively.

### B.    PGA TOUR's ShotLink System

ShotLink is PGA TOUR's system for capturing and determining information about golf shots during golf tournaments. A variety of equipment and personnel are used to determine and calculate data such as the path of the ball through the air, the speed of the ball during flight, and the location of the ball after it comes to rest. That data is aggregated and then distributed for use by PGA TOUR's Digital Operations team as well as by third parties who have licensed the data. Lovell Decl. ¶ 2. [2]

PGA TOUR's Digital Operations team is responsible for creating the digital platforms that golf fans can use to interact with PGA TOUR electronically.  These platforms include PGA TOUR's website (www.pgatour.com) and PGA TOUR's mobile app for iPhones and Android devices. Lovell Decl. ¶ 3.

The public generally cannot access ShotLink. However, one of the Digital Operations platforms is called TOURCast, which can be found on pgatour.com and within the PGA TOUR

---

[2] The Declaration of Walter Kenneth Lovell In Support of Defendant's Motion for Summary Judgement is contemporaneously-filed and referred to herein as "Lovell Decl."

mobile app. By using their computers or phones to access TOURCast, the public can view data that originated from ShotLink, such as by viewing shot trails showing the path of a golf shot. Lovell Decl. ¶ 5.

### C.    PGA TOUR's Agreement With IMG Arena

PGA TOUR has a contract with a company in Europe known as IMG Arena that includes a license to certain ShotLink data. In connection with the contract, PGA TOUR sends IMG Arena data from the ShotLink system during golf tournaments. IMG Arena is then permitted to use the data for its own business purposes, which relate to sports betting. Lovell Decl. ¶ 6.

Critically, PGA TOUR's performance of its contractual obligations with IMG Arena does not involve a second (patron's/user's) portable device in any way. PGA TOUR uses its ShotLink system to obtain data about golf shots during the golf tournament, and then provides the data to IMG Arena. There simply is no "second portable device" as required by the claims – that is, a portable device carried by patrons of the golf tournament/users viewing the tournament, let alone one that includes the required equipment manufacturer endorsements. Lovell Decl. ¶ 7; Ex. 4, Valerdi Dep. 206:2-7.

Indeed, not only does PGA TOUR have nothing to do with a second portable device in connection with IMG Arena, but there is not even any evidence that IMG Arena does anything in connection with a "second portable device" that meets the requirements of the claims:

> Q.  Okay. Is there any evidence that you're aware of that anyone in connection with IMG Arena accesses ShotLink data over a second portable device that meets all the requirements of the claims?
>
> MR. BARR:· Object to form.
>
> THE WITNESS:· Not that I am aware of.

Ex. 4, Valerdi Dep. 206:2-7.

**D.      The Accused Products And Alleged Damages From Infringement**

Plaintiff alleges that PGA TOUR is infringing in two ways.  First, by using its ShotLink system to collect data at golf tournaments and then licensing and sending the data to IMG Arena. *See* Ex. 5 ¶ 9; Ex. 6 at 55:1-21.  Second, by the combination of using the ShotLink system with members of the public using their computers and phones to access PGA TOUR's website or PGA TOUR's mobile app to view the ShotLink data.  *See* Ex. 4, Valerdi Dep. 64:2-8.

Plaintiff's damages claim has two corresponding components. First, Plaintiff is seeking a lump-sum royalty from the fees that IMG Arena pays PGA TOUR under the IMG Arena contract. Ex. 5, Blok Expert Report ¶ 9; Ex. 6, Blok Dep. 55:1-21. Second, Plaintiff is a running royalty based on the number of unique users per month who access PGA TOUR's website and mobile app. Ex. 5, Blok Expert Report ¶ 8; Ex. 6, Blok Dep. 26:23-27:11.

## III.    SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Flash-Control, LLC v. Intel Corp.*, No. 1:19-CV-01107-ADA, 2020 WL 4561591, at \*2 (W.D. Tex. July 21, 2020), *aff'd,* No. 2020-2141, 2021 WL 2944592 (Fed. Cir. July 14, 2021).  "A dispute concerning a material fact is genuine, and therefore sufficient to overcome a summary judgment motion, if the evidence is such that a reasonable jury could return a verdict for  the nonmoving party." *Heartbrand Holdings, Inc. v. Whitmer,* No. SA-19-CV-358-HJB, 2021 WL 1947875, at \*2 (W.D. Tex. May 14, 2021) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (internal citations omitted).

IV.    **ARGUMENT**

A.    **PGA Tour's Fulfillment Of The IMG Arena Contract Is Noninfringing Because It Entirely Omits The Required Second Portable Device**

Plaintiff asserts that PGA TOUR's actions in licensing and distributing ShotLink data to IMG Arena infringe the asserted patents. Thus, as an independent component of infringement damages, Plaintiff is seeking a "separate, lump-sum royalty" from the revenues PGA TOUR is expected to receive under the IMG Arena contract for "distributing and licensing ShotLink data for betting purposes." *See* Ex. 5, Blok Report ¶¶ 8-9; Ex. 6, Blok Dep at 55:1-21

Plaintiff should not be permitted to seek damages in connection with the IMG Arena contract because it is undisputed that PGA TOUR's licensing and distribution of ShotLink data to IMG Arena entirely omits any use of the "second portable device" that is required by all the asserted patent claims. *See* Lovell Decl. ¶ 7; Ex. 4, Valerdi Dep. 206:2-7. Because there is no evidence of the required "second portable device" in connection with the IMG Arena contract, PGA TOUR is entitled to partial summary judgment of noninfringement, eliminating that contract and the lump-sum royalty being sought by Plaintiff on that contract from the case.

More particularly, all four asserted independent claims require a second portable device carried by a patron/user viewing the golf tournament that both (a) receives over a wireless network data about the golf tournament that had been input by a spotter into a first portable device, and (b) either displays or has in memory endorsements of golf tournament participants by manufactures of equipment used by those participants (for example, as an endorsement of a golfer by the manufacturer of the golf clubs he uses):

> '832 patent claim 1: A system … comprising: a **first portable device** … being configured to receive **input data from the spotter** regarding status of a selected player's golf ball …; a **second portable device carried by a patron** of the sporting event to **receive transmitted input data** over the wireless network, … the **second portable device** comprising a memory with pre-programmed information stored

therein, the pre-programmed information **including endorsements** of respective participants of the golf tournament by manufacturers of equipment used by the respective participants of the golf tournament; …

<u>'832 patent claim 5</u>:  A method … comprising: providing a first portable device to be carried by a … spotter; **inputting data by the spotter to the first portable device** …; **transmitting input data** over the wireless network to a **second portable device carried by a patron** of the golf tournament in real time during the golf tournament, the **second portable device** comprising a memory with pre-programmed information stored therein, the pre-programmed information **including endorsements** of respective participants of the golf tournament by manufacturers of equipment used by the respective participants of the golf tournament; …

<u>'552 patent Claim 1</u>:  A system … comprising: a **first portable device** … being configured to receive **input data from the spotter** regarding status of a selected player's golf ball …; a **second portable device carried by a user** viewing the golf tournament to **receive distributed input data** over the wireless network, … the **second portable device** being configured to display preprogrammed information … **including endorsement** information of manufacturers of equipment used by the respective participants of the golf tournament; …

<u>'552 patent Claim 13</u>: A method … comprising: providing a first portable device …; **inputting data by the spotter to the first portable device** …; distributing input data over the wireless network to a **second portable device carried by a user** in real time during the golf tournament, the **second portable device** being configured to display **endorsement** information … **including** endorsements of respective participants of the golf tournament by manufacturers of equipment used by the respective participants of the golf tournament; …

Ex. 1, '832 patent at claims 1 and 5; Ex. 2, '552 patent at claims 1 and 13.

In connection with the IMG Arena agreement, PGA TOUR collects data concerning the golf tournament using its ShotLink system and transmits that data to IMG Arena. Neither step involves a "second portable device carried by a patron/user" – let alone one that receives the input data over a wireless network and contains or displays endorsement information of participants in the tournament by manufacturers of equipment used by the participants, as the claims require. Lovell Decl. ¶¶ 6-7.

Notably, Plaintiff's expert on infringement, Dr. Valerdi, admitted in his deposition that he is not aware of any evidence of a "second portable device" in connection with the PGA TOUR/IMG Arena contract, and that he has no opinion about whether PGA TOUR's fulfilment of its obligations to IMG Arena involves a "second portable device":

Q.  Okay. And in connection with this agreement, PGA Tour supplies IMG Arena with data that's collected from the ShotLink system, correct?

A.  That's my understanding.

Q. Okay. **The collection of data performed by the ShotLink system does not involve a second portable device, correct**?

MR. BARR: Object to form.

THE WITNESS: **Yeah, I could agree with that**.

…
Q.  ... Is it your understanding that the IMG Arena requires PGA Tour to send data gathered by the ShotLink system to IMG Arena?

A. Yes, generally my understanding is that is one of the things they are doing.

Q. Okay. Do you have any basis for concluding that there is a second portable device as required by the claims that is needed or used in conjunction with what PGA Tour does for IMG Arena?

MR. BARR: Object to form.

…
THE WITNESS: Okay. You've asked me about the IMG agreement, and I'm just turning to that page of my report to refresh my memory. Okay. I have turned to that section of my report. I have a -- I have refreshed my recollection on my opinion related to the IMG agreement, and I'm happy to answer any questions about that section of my report.

Q.  Okay. Well, maybe you don't have an opinion on this. Maybe -- because I don't know that it's in your report. So let me just ask you, **do you have an opinion as to whether or not there is use of a second portable device in conjunction with PGA Tour's obligations and fulfilling its obligation to IMG Arena**?

A. **I didn't opine on that or include anything of that nature in my report, so I do not have an opinion**.

62236959;16

…

Q. **Is there any evidence that you're aware of that anyone in connection with IMG Arena accesses ShotLink data over a second portable device that meets all the requirements of the claims**?

MR. BARR: Object to form.

THE WITNESS: **Not that I am aware of**.

Ex. 4, Valerdi Dep. 143:10-18, 146:11-20, 147:4-19; 206:2-7 (emphases added).

Because there is no "second portable device" meeting the requirements of the asserted claims in connection with anything PGA TOUR does for IMG Arena under the IMG Arena contract, Plaintiff is not entitled to a portion of the fees PGA TOUR receives under that contract as reasonable royalty damages as a matter of law.

**B.     The Asserted Claims Are Not Infringed Because It Is Third Party Golf Fans, Not PGA TOUR, That Own And Use The Required "Second Portable Device"**

PGA TOUR is also entitled to summary judgment of noninfringement in connection with the second category of alleged infringement, which is the combination of PGA TOUR's use of the ShotLink system to collect data at golf tournaments with members of the public using their portable devices like phones or laptops to view ShotLink data on PGA TOUR's website or mobile app. Ex. 4, Valerdi Dep. 61:23-63:4, 64:2-8. Here, Plaintiffs have a divided infringement problem.

**1.     The Asserted Independent Apparatus Claims**

Plaintiff is asserting one independent apparatus claim and one independent method claim from each of the '832 and '552 patents.  Claim 1 in each patent are the apparatus claims, and they are nearly identical.  Claim 1 of both patents require:  (1) a "first portable device configured to be carried by … a spotter of the golf tournament" for inputting data about golf shots; (2) a "second portable device" carried by a patron of the sporting event ('823 patent claim language) or by a user viewing the golf tournament ('552 patent claim language); and (3) a "production module" that

receives input data from a plurality of spotters and distributes the input data to second portable devices in response to data requests from the second portable devices. *See* Ex. 1, '832 patent at claim 1; Ex. 2, '552 patent at claim 1.

Plaintiff alleges that various components of PGA TOUR's ShotLink data collection system used by ShotLink personnel meet the "first portable device" limitation, and that various back-end components of PGA TOUR's ShotLink system meet the "production module" limitation. Ex. 3, Valerdi Infringement Report at 59 and ¶¶ 27, 75; Ex. 4, Valerdi Dep. 72:13-73:3, 109:5-111:13. However, the "second portable device configured to be carried" by a patron of the sporting event (or a user viewing the golf tournament) is something owned and operated by a member of the public, namely a smartphone, laptop, or other portable device used by the patron/user to access PGA TOUR's website or to run PGA's mobile app to view data that originated from ShotLink. *E.g.*, Ex. 4, Valerdi Dep. at 61:23-63:4 (examples of the "second portable device" include a user's/patron's Apple iPhone or laptop computer, such as Plaintiff's expert's own iPhone). Thus, two of the limitations are components used by PGA TOUR, but the "second portable device" component is used by members of the public.

For there to be infringement of an apparatus claim by use, there needs to be a single party using all elements of the claimed system. *Centillion Data Systems LLC v. Qwest Communications International Inc.*, 631 F.3d 1279, 1284 (Fed. Cir. 2011); *see also Acceleration Bay LLC v. 2K Sports, Inc.*, 15 F.4th 1069, 1074 (Fed. Cir. 2021) (upholding the district court's finding that "making a system under § 271(a) requires a single entity to combine all the claim elements and that, if a customer, rather than an accused infringer, performs the final step to assemble the system, then the accused infringer has not infringed."). For purposes of infringement, use of the system requires a party to "control the system as a whole and obtain benefit from it." *Id.*.

13

In *Centillion*, the patent disclosed a "system for collecting, processing, and delivering information from a services provider … to a customer." *Id*. at 1281. Three of the four claim elements concerned the "back-end" system maintained by the service provider (Qwest), but the last claim limitation was directed to the front-end personal computer used by the user (Qwest's customer). *Id*. Even though Qwest operated the back-end system meeting the first three claim limitations, ***and even though Qwest provided the software that customers used on their personal computers in connection with the final limitation***, the Federal Circuit held there was no infringement because it was the customer, not Qwest, that put the personal computer required by the fourth claim limitation into use. *Id*. at 1286-87. "Supplying the software for the customer to use is not the same as using the system."  *Id*. at 1286.

The apparatus claims here are analogous to the claim in *Centillion*. Even assuming *arguendo* that PGA TOUR operates components that meet the "first (spotter's) portable device" and the "production module" limitations as alleged by Plaintiff, PGA TOUR does not put into use the patron's/user's smartphone or other portable device that constitutes the "second portable device." Under Plaintiff's infringement allegations, PGA TOUR controls the first portable device, but members of the public control the second portable device. *See* Ex. 4, Valerdi Dep. 64:2-8. Just as in *Centillion*, that is so even if the patron/user runs the PGA TOUR mobile app software or accesses the PGA TOUR website on his or her second portable device. It is still the member of the public that is putting his or her portable device into use, not PGA TOUR.  *See also Acceleration Bay*, 15 F.4th at 1078 (Fed. Cir. 2021) (***rejecting*** patent owner's argument that although the video game manufacturer defendant did not make the hardware that customers used to play the accused video games, there was direct infringement because the defendant's accused software caused the processors in the customer's consoles to act in a way that satisfies the elements of the asserted

claim; holding "The customer, not [the software-supplying defendant], completes the system by providing the [hardware component] and installing the client software.")

Consequently, PGA TOUR is entitled to summary judgment of noninfringement on the asserted apparatus claims.

### 2.  The Asserted Independent Method Claims

The remaining asserted independent claims, claim 5 in the '832 patent and claim 13 in the '552 patent, are similar method claims. Both recite some steps that Plaintiff alleges are performed by PGA TOUR personnel, such as "providing a first portable device to be carried by a … spotter…" and "inputting data by the spotter to the first portable device regarding status of a player's golf ball …" Ex. 1, '832 patent at 16:17-34; Ex. 2, '552 patent at 16:52-67; Ex. 3, Valerdi Infringement Report ¶¶ 68, 72, 75.  However, at least the last limitation of these claims require a step that is performed by the patron's/user's second portable device and the patron/user operating it.  Specifically, the second portable device must selectively display graphical representations of certain information according to inquiries of the patron/user.  For example, claim 13 in the '552 patent recites:

> 13.  A method … comprising …
>
> …
>
> inputting data by the spotter to the first portable device regarding status of a player's golf ball … [a step to be **_performed by PGA Tour personnel operating PGA TOUR's alleged first portable device_**]
>
> …. and
>
> selectively displaying graphical representations of the transmitted data and endorsement information on the second portable device according to inquiries of the user. [a step to be **_performed by a member of the public's operation of his/her second portable device_**].

Ex. 2, '522 patent at 16:49-28. Claim 5 from the '832 patent is similar, but omits the phrase "and endorsement information."

For there to be infringement, all the steps of a method claim must be attributed to a single actor. *See Travel Sentry, Inc. v. Tropp*, 877 F.3d 1370, 1376 (Fed. Cir. 2017). "Where more than one actor is involved in practicing the steps, a court must determine whether the acts of one are attributable to the other such that a single entity is responsible for the infringement." *Akamai Technologies, Inc. v. Limelight Networks, Inc.,* 797 F.3d 1020, 1022 (Fed. Cir. 2015) (*en banc*). Plaintiff must have evidence sufficient for a jury to find "either (1) one party exercises the requisite 'direction and control' over the other's performance or (2) the actors form a joint enterprise such that performance of every step is attributable to the controlling party." *Gabriel de la Vega v. Microsoft Corp.*, Case No. W-19-CV-0612-ADA, slip op. at 6 (W.D. Tex. Feb 7, 2020) (Albright, J.) (attached as Ex. 7).

Plaintiff's expert on infringement opines that some steps in these method claims are performed by PGA TOUR's personnel, such as an authorized tablet operator performing the step of "inputting data by the spotter to the first portable device regarding status of a player' golf ball during the golf tournament in real time …" *See* Ex. 3, Valerdi Infringement Report at 76, 187. But the expert acknowledges that at least the last step of "selectively displaying graphic representations … on the second portable device according to inquiries of the user" is performed by the second portable device, owned and operated by the patron/user that is a member of the public. *See id.* at 209 ("My inspection of the ShotLink source code confirms that **the second portable device displays endorsements** of the respective participants of the golf tournament."); *see also id.* at 95 (relying on screenshot from patron's second portable device in support of meeting the limitation

"selectively displaying graphic representations of the transmitted data on the second portable device according to inquiries of the patron" in claim 5 of the '832 patent).

Thus, the steps required by the asserted method claims are performed by multiple actors – the PGA TOUR personnel operating the alleged first portable devices, and the patrons/users operating the alleged second portable devices. Yet Plaintiff's expert provides no analysis or evidence that would support a jury finding that PGA TOUR exercises the 'direction and control' over the patron's/user's actions that is necessary to attribute the patron's/user's actions to PGA TOUR. The expert merely conclusory states, "Defendant owns, controls, and makes beneficial use of each element of the system claims and performs or causes to be performed through contractual relationships each step of the method claims" – an unsupported recitation of the legal standard. *Id*. at 78. Plaintiff's infringement expert fails to disclose the basis for this bare opinion, and in fact, there is no evidence supporting it. *Id*.

Because Plaintiff does not have evidence sufficient to support a jury verdict of infringement of the asserted method claims in light of the claims requiring different steps to be performed by different actors, PGA TOUR is entitled to summary judgment on them.

### C.   PGA TOUR Does Not Infringe Because Its ShotLink System Does Not Include The Input Of The "Condition Of The Ball"

All of the asserted claims require a spotter to input several items of data that include the "condition of the ball" – construed by the Court to mean "physical state of the ball" – into a first portable device. Ex. 1, '832 patent at 15:37-38, 16:32-33, 17:29; Ex. 2, '552 at 15:38, 16:66, 18:8. PGA TOUR simply does ***not*** input the condition/physical state of the ball into its accused ShotLink system. Lovell Dec. ¶¶ 8-9. Because the accused system does not include input of the condition of the ball, PGA TOUR cannot be found to infringe any of the asserted claims.

17

Plaintiff's infringement expert Dr. Valerdi, who is a technology expert but not a golf expert, (Ex. 4, Valerdi Dep. 12:20-13:1), opines that the inclusion of information about the **location** of the ball, and the alleged inclusion of information about the **lie** of the ball, meets the separate claim requirement for information about the "condition of the ball." Ex. 3, Valerdi Infringement Report at 45-46, 81, 192-193. In reaching that conclusion, Dr. Valerdi relies upon a conversation he had with a third party named Jay Goble about the scope of the phrases "condition of the ball" and "physical state of the ball." *See id*. at 8, 45-46, 48, 81, 147, 192-93. Mr. Goble is apparently a golf coach who was introduced to Dr. Valerdi by Plaintiff's counsel. Ex. 4, Valerdi Dep. 69:7-10. Dr. Valerdi relies on Mr. Goble's alleged but unexplained views that "the **condition of the ball includes the lie**, for instance, whether the ball is in a bunker, whether the ball is in a divot, or whether the ball is in the water." Ex. 3, Valerdi Infringement Report at 45-46 (emphasis added). Dr. Valerdi also relies on Mr. Goble's remarkable further views that the phrases "on tee", "landing area," and "around the green," which he admits "are locations where the golf ball could be on the golf course," are descriptions of the **physical state of the ball**. *See* Ex. 3, Valerdi Infringement Report at 45-46 (emphasis added).

In the contemporaneously-filed *Daubert* motion regarding Dr. Valerdi, PGA TOUR is moving to have Dr. Valerdi's opinion about "condition of the ball" stricken for improper reliance on Mr. Goble's hearsay statements. For the reasons set forth in the *Daubert* motion, Dr. Valerdi's reliance on Mr. Goble's hearsay violates Rule 703 and lacks the reliability required in expert testimony. Even apart from those issues, however, Dr. Valerdi's resulting opinion that data about the **location** of the ball or the **lie** of the ball satisfies the separate "**condition of the ball**" requirement fails to raise a genuine issue of material fact.  No reasonable jury could find that the "condition of the ball" as construed by the Court refers to the location or lie of the ball.

First, Dr. Valerdi's opinion that the "condition of the ball" is satisfied by data regarding the lie or location of the ball contradicts the Court's constructions. The Court has construed "condition of the golf ball" to mean the "physical state of the ball," and "lie" to mean "the physical environment immediately adjacent to the golf ball in its current position." *See* Ex. 3, Valerdi Infringement Report at 13-14. Moreover, during the *Markman* hearing, the Court **rejected** Plaintiff's proposed construction that "condition of the ball" may mean "*location* or physical state." *See* Ex. 8, *Markman* Hr'g Tr. at 41:24-42:8, 44:16-19. Dr. Valerdi's opinion that the condition of the ball requirement is satisfied by data on the ball's location and lie contradicts the Court's *Markman* rulings. Location and lie of the ball are plainly not the condition of the ball as construed.

Second, the independent claims themselves separately reference location, lie, and condition of the ball, reinforcing that they are three different things. *See*, *e.g.*, Ex. 1, '832 patent at 15:33-34 ("the location and distance of the selected player's ball"), 15:37-38 ("the lie and the condition of the golf ball").

Third, in describing the alleged invention, the specification itemizes various types of data about the ball that a spotter may input into the first portable device. "Condition of the ball" is listed separately from location and lie, again leaving no doubt that they are different attributes:

> The information is obtained from personnel (spotters) who have special permitted access to the course and players in order to track the location and distance of a player's balls, including special knowledge regarding status of the event, for example, club selection, *lie of the ball*, *condition of ball*, *distance* from markers, length of putt, order of play, scores, etc., thus enabling the spotters to input information using the spotter's portable device to the network for transmission to the patron portable devices ….
>
> …
> For example, the spotter can input information about the *location*, *condition*, and '*lie*' of a particular player's ball, the order of play …

…
In some embodiments, the circuitry of the portable device used by the spotter is programmed to record and transmit various characteristics, such as but not limited to golfers appearance, golfers equipment, ***golfers ball general location, golfers ball GPS location, golfers ball condition,*** golfers strokes as they occur, golfers penalty strokes, the club which Golfers are to use, and time periods of golfers next action.

Ex. 1 at 6:27-42; 7:51-53, 8:7-14.

Similarly, Figure 11 in the specification provides an example of a screen from a patron's "second portable device" stating that Player A's ball is "Clean" and Player B's ball is "Dirty" – attributes of the condition/physical state of the ball, separate from the ball's location or lie:



There is still further evidence confirming that Plaintiff's expert has not raised a genuine issue of material fact by claiming that location and lie data are "condition of the ball." The Rules of Golf for 2019 (published jointly by the United States Golf Association and the R&A Rules Limited) applies the term "condition" to golf equipment twice: once to a damaged golf club ("Have the club repaired by restoring it as nearly as possible to its condition before the damage happened

…", Ex. 9 at 15); and once to a golf ball ("A player's ball at rest may be identified … By finding a ball with the same brand, model, number and condition as the player's ball in an area where the player's ball is expected to be …", *id*. at 41-42). In neither case is condition conflated with location or lie; it refers specifically to the physical state of the club or ball itself. This usage is consistent with the patent specification, in which "lie", "location", and "condition of the golf ball" are explicitly differentiated as separate things.  *See* Ex. 1, '832 patent at 6:36-37, 7:51-52.

Notably, the phrase "condition of the ball" is explicitly used to refer to such things as being muddy or scuffed in the rules of at least one other sport. In cricket, ball tampering is the illegal alteration of the "condition of the ball." Ex. 10, Laws of Cricket, (stating that "[it] is an offence for any player to take any action which ***changes the condition of the ball***. Except in carrying out his/her normal duties, a batter is not allowed to willfully damage the ball. ***A fielder may, however***, 41.3.2.1 ***polish*** the ball on his/her clothing provided that no artificial substance is used and that such polishing wastes no time. 41.3.2.2 ***remove mud*** from the ball under the supervision of an umpire. 41.3.2.3 ***dry a wet ball*** on a piece of cloth that has been approved by the umpires."); Ex. 15, Sydney Morning Herald Article, at PT-0007820 ("A ball may be polished, though not with an artificial substance, dried with a towel if it is wet, and wiped clean of mud under supervision. Any other action that changes the condition of the ball is against the rules.")

Finally, numerous PGA TOUR witnesses have testified, consistent with the Court's construction, that the condition of the ball refers to such things as whether the ball is dirty or damaged, but not to the location or lie of the ball.  *See* Ex. 11, Dennis Dep. 64:22-23, 84:11-18 (stating the condition of the ball refers to the "physical state of the ball" such as whether the ball is "scratched or damaged or . . . scuffed."); *id*. at 36:17-22, 91:7-11 ("Q.  And you're saying that the spot where the ball is resting could never be termed the condition of the ball? A. Yeah, I've

never heard anyone use that before"), 91:12-20 ("Q. Have you ever heard anyone use the definition of whether the ball is dirty or clean or scuffed as the condition of the ball? A. Yeah -- yes, I have. I mean, if someone asked me what the condition of my golf ball was, I would respond by describing, you know, physical characteristics of it. So if it was dirty, I would say it was dirty. Or if it had a cut on it, I would say it's cut."), 98:3-14 ("Q: But you're not saying, are you, sir, that in the context of the '832 or the '552 patent, that condition of the golf ball cannot mean the location of -- include the location of the ball relative to the GPS survey? A. Yeah, I'm stating in the -- in the context of playing golf, of people who would understand terms and, you know, definitions and things like that, used in the game, that those -- those statements about condition of the golf ball being the location of the ball relative to the GPS survey would not be something that I would expect to hear from a golfer."); Ex. 12, Lovell Dep. 211:8-12-23, 212:6-12 (condition of the ball "describes the specifics of the ball itself, the condition of the outside, whether it's scuffed, broken, split, those kinds of things, the ball itself," not the location of the ball).

There is one final point to address with respect to condition of the ball. There are three dependent claims in the asserted patents that include the limitation, "wherein the condition of the ball includes a location of the ball relative to the GPS survey." That contrived language, however, should be ignored. As explained below in connection with invalidity, that claim language was added during the prosecution of the '832 patent. Ex. 13, Aug. 5, 2013 Response to Office Action, at 4 (adding new claim 10). However, the specification does not describe anywhere that the condition of the ball includes a location of the ball relative to a GPS survey. By attempting to artificially expand during prosecution what constitutes "condition of the ball," the amendment introduced new matter, making claims 9 and 14 of the '832 patent and claim 18 in the '552 patent invalid under § 112 for lack of written description.

**D.**     **All The Asserted Claims Are Invalid Under 35 U.S.C. § 101 For Claiming The Abstract Idea Of Collecting, Processing, And Distributing Data Without A Technological Invention**

All the asserted claims are invalid under 35 U.S.C. § 101 for claiming the abstract idea of collecting, processing, and distributing data in a particular field (golf). *See Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014). The asserted claims here have no patentable difference from those found by the Federal Circuit to be directed to ineligible subject matter in *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350, 1351 (Fed. Cir. 2016). As in *Electric Power*, the claims here "do not go beyond requiring the collection, analysis, and display of available information in a particular field, stating those functions in general terms, without limiting them to technical means for performing the functions that are arguably an advance over conventional computer and network technology." *Electric Power*, 830 F.3d at 1351.

**1.**     ***Alice* Step One: The Asserted Claims Are Directed to an Abstract Idea**

Claim 1 of the '832 patent is representative of the asserted independent claims.  Although wordy, it boils down to three well-known and conventional computing devices communicating golf-related data over a conventional wireless network to do the conventional tasks of inputting data from a particular field, transmitting the data from one device to another over the network, requesting the data, and displaying it.

Indeed, the claim begins by claiming a "system of gathering, processing, and distributing information of a golf tournament over a wireless network, comprising."  Ex. 1, at Claim 1. The other asserted independent claims (claim 5 of the '832 patent and claims 1 and 13 of the '552 patent) have almost identical preambles. This is the abstract idea that is carried throughout the claims.

The claim then recites three components.  The first is a "first portable device" to be carried and used by a spotter to input data about a golf tournament and then transmit the data over a wireless network.  No particular method for determining the needed data (like the lie and condition of the ball) is specified.  This is the data collection, which is an abstract idea.  *Electric Power*, 830 F.3d at 1353 ("Accordingly, we have treated collecting information, including when limited to particular content (which does not change its character as information), as within the realm of abstract ideas.") (citations omitted).

The second component is a "second portable device" carried by a patron of the tournament (a member of the public) to receive the input data over the wireless network and display the data according to the patron's input.  This is the abstract idea of distributing (and displaying) data, which is an abstract idea.  *See Electric Power*, 830 F.3d at 1354.

Finally, the third component is a "production module" that receives input data over the wireless network from the spotters, displays the data, receives data requests over the wireless network from the second portable devices, and selectively distributes the data. This is processing (*i.e.*, analyzing) data, which is also an abstract idea.  *Electric Power*, 830 F.3d at 1354 ("In a similar vein, we have treated analyzing information by steps people go through in their minds, or by mathematical algorithms, without more, as essentially mental processes within the abstract-idea category.") (citations omitted).

The patent specification confirms that the claimed invention is an abstract idea: "Embodiments of the present <u>general inventive concept</u> provide systems and methods of <u>gathering, processing, and broadcasting real-time information</u> of the sporting event to portable devices carried by spectators of the sporting event." Ex. 1 at 1:41-45 (emphasis added); *see also id.* at 1:10-20 ("The present general inventive concept relates generally to an information gathering, processing,

and broadcasting system, and more particularly, to a sports information gathering, processing, and broadcasting system …")

That the claimed invention is an abstract idea was likewise confirmed by the inventor:

Q. What idea did you come up with?

A. The idea that's addressed in my patent.

Q. How would you articulate what your idea was?

A. ***The harvesting, processing, and gathering and -- and distribution of information***.

Ex. 16, Long Dep., June 30, 2021, 54:18-22 (emphasis added).

Still further, Plaintiff's expert Dr. Valerdi has admitted that just as in *Electric Power*, the claimed invention here is not an improvement to computer technology.  In Dr. Valerdi's words, "The technology of the systems and methods of the Asserted Patents are related to sports information gathering and broadcasting technologies, not on improving computer technology." Ex. 17, Valerdi Rebuttal Export Report ¶ 38.  Indeed, as detailed below in connection with Step 2 of the *Alice* analysis, all of the components required by the claims are well-known, conventional computer components. *See* Ex. 1, '832 patent at 7:43-47 (the first and second portable devices can be a conventional Apple iPod Touch), 8:19-27 (the production module is one or more on-site generic computer servers, processors, and network interface equipment), Fig. 32 (depicting the claimed components as conventional computer devices communicating on a conventional wireless network at the golf course). "[T]he mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 573 U.S. at 223.

Claim 1 of the '552 patent is nearly identical to claim 1 of the '832 patent. The remaining two asserted independent claims are method claims that merely re-write claim 1 into method steps. All four claims seek to claim the same abstract idea.

Thus, the asserted claims are not any different from those found to be directed towards an abstract idea in *Electric Power*. The Federal Circuit determined that the focus of the "lengthy" claims there was on the abstract idea of "collecting information, analyzing it, and displaying certain results of the collection and analysis." *Electric Power,* 830 F.3d at 1353-54. The asserted claims here are likewise focused on the analogous abstract idea of collecting, processing, and distributing the results of the collection and processing.

> **2.** ***Alice* Step Two: The Asserted Claims Do Not Recite An Inventive Concept**

"To save a patent at step two [of the § 101 analysis under *Alice*], an inventive concept must be evident in the claims." *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017). The inventive concept must provide "significantly more" than the abstract idea itself. *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1289-90 (Fed. Cir. 2018). "Well understood, routine, conventional" or "purely functional" claim elements cannot confer patent-eligibility. *Alice*, 134 S. Ct. at 2359-60; *In re TLI Commc'ns Patent Litig.*, 823 F.3d 607, 611-12 (Fed. Cir. 2016).

Here, again as in *Electric Power*, the asserted claims merely recite "off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information," thereby failing to recite an inventive concept. *Electric Power*, 830 F.3d at 1355; *see also USC IP P'ship, L.P. v. Facebook, Inc.,* 6-20-CV-00555-ADA, slip op. at 12 (W.D. Tex. Dec. 8, 2021) ("The asserted claims recite generic and well-known 'web pages,' 'web browsers' and 'databases' that were well known in the prior art long before the filing of the '300 patent in 2011").

The specification explicitly explains that each of the claimed portable devices can be "commercially available device[s]" such as "an Apple iPod Touch", and that the production module is generically "one or more on-site, centrally located computer servers, processors, and

interface equipment." Ex. 1, '823 patent at 7:43-47, 8:19-20.  Indeed, the specification points out that "the present general inventive concept is not limited to any particular number or type of portable devices, or to any particular type of communications networks." *Id. at* 8:24-27.

Likewise, Plaintiff's infringement expert testified that the first and second portable devices can be "off-the-shelf commercial products," the alleged invention doesn't include "any kind of special server or new, improved computer," and the "wireless network is intended to include using conventional wireless technologies." Ex. 4, Valerdi Dep. 184:2-185:14.  In sum, as Plaintiff's expert admitted, the claims only require conventional computer and network equipment:

> Q.  Is there any piece of hardware, comp[uter] equipment or network equipment, required by the claims to be something other than a conventionally available piece of hardware?
>
> A.  No, I don't believe so.

Ex. 4, Valerdi Dep. 185:15-19; *see also* Ex. 18, Rule 30(b)(6) Long Dep., November 30, 2021, 18:10-20:5 (same).

Furthermore, the asserted claims also do not recite an "ordered combination" that "transform[s] the nature of the claim into a patent eligible application." *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1304 (Fed. Cir. 2019).  The claims set forth the basic tasks of collecting data, processing it, and distributing it for display in their natural, obvious order dictated by the abstract idea of collecting, processing, and distributing the information for display. *See USC IP P'ship, L.P. v. Facebook, Inc.*, Case No. 6-20-CV-00555-ADA, slip op. at 13 (W.D. Tex. Dec. 8, 2021) ("the claims merely reflect a sequence performed in a logical order dictated by the abstract idea, and does not 'transform the nature of the claim into a patent-eligible application' 'as an ordered combination.'")

Likewise, all the steps and functions required by the claims are generic, ordinary computer functions, such as a human (spotter) inputting golf tournament data into a portable device, which then transmits data over a wireless network; a production module receiving the data and displaying, processing, and distributing it in response to queries for the data; and another human being (the patron/user) using another portable device to send the queries for the data, which is received and displayed.   These are all generic computer tasks, and none need to be performed in an unconventional way.

Indeed, the inventor confirmed this.   In a letter he wrote to attempt to interest the PGA TOUR in his alleged invention, he wrote that his invention operates hardware components "in an unconventional manner." When asked at his deposition what he meant by operating the hardware components in an unconventional manner, he responded, "Sounds like puffery." Ex. 16,  Long Dep., June 30, 2021, 199:5-17.

Thus, the asserted independent claims do not recite a "significantly more" inventive concept.

Furthermore, none of the dependent claims change this conclusion.  They all either recite a type of golf-related data to be collected or displayed, or additional conventional computer arrangements, none of which transform the abstract idea into patent-eligible subject matter.

For example, claim 2 of the '832 patent recites that the portable devices are linked together via the wireless network – something the specification conclusorily states without further explanation.  Ex. 1 at 2:1-2.  Claim 3 of the '832 patent and claim 4 of the '552 patent just recite that the portable devices are commercially available handheld devices.  Claim 4 of the '832 patent recites that the wireless network is a local MESH network, which was well-known technology already in use by PGA TOUR on golf courses before the patents' priority date. *See* Ex. 4, Valerdi

Dep. 164:8-24, 166:12-20; https://www.youtube.com/watch?v=NN6QUzFcSW8 at timestamps 5:04-5:30 (describing the MESH network on the golf course in a video dated Sept. 20, 2009).  For their part, claim 20 of the '832 patent and claim 11 of the '552 patent recite a generic user interface for displaying data.   Thus, these dependent claims merely recite well-known conventional computer devices and arrangements.  *Alice*, 573 U.S. at 223.

Claims 6 and 9 of the '832 patent and Claims 5 and 14 of the '552 patent add the acquisition and use of global positioning system (GPS) data.  However, "[a] GPS device is a well-known generic computer element insufficient to make otherwise patent-ineligible subject matter patentable."  *Rothschild Location Techs. LLC v. Geotab USA, Inc.*, No. 6:15-cv00682, Op. at 6-7, 10, 12-13 (E.D. Tex. Jan. 4, 2016); *Rothschild Location Techs. LLC v. Geotab USA, Inc.*, No. 6:15-cv00682 (E.D. Tex. May 16, 2016) (adopting report and recommendation).

Finally, the remaining dependent claims merely recite types of golf data that is input (claim 11 of the '832 patent) and displayed (claims 19 and 23 of the '832 patent and claims 9 and 12 of the '552 patent).  Specifying additional golf information to be collected, generically "processed," or displayed has no bearing on the patentability of the claims under § 101. *See Electric Power* 830 F.3d at 1355.

Notably, Dr. Valerdi conclusorily asserts that the claimed invention provides improvement to sports information and gathering and broadcasting technology by "improving the real-time gathering and processing of input data through the simultaneous collection of input data and enhancing the real-time distribution of requested data" and "improv[ing] the types, speed of transmission, and accuracy of input data". Ex. 17, Valerdi Rebuttal Expert Report ¶¶ 33-43.  There are two problems with this assertion.

First, the specification does not in fact disclose **how** to achieve "real-time" gathering and processing of input data. All the specification does is conclusory state, repeatedly, that the information is collected and provided "in real time," without any explanation of **how** other than by generic use of the conventional computer technology recited in the claims. *See*, *e.g.*, Ex. 1 at 5:19-22; 5:30-31; 6:39-40. Thus, this case is again like *Electric Power*. The asserted claims indicate that "it is desirable to gather, analyze, and display [data], including in 'real time'; but they do not include any requirement for performing the claimed functions of gathering, analyzing, and displaying in real time by use of anything but entirely conventional, generic technology." *Electric Power*, 830 F.3d at 1356.

The same is true regarding the alleged improvement of "simultaneous collection of input data." There is no disclosure of how the invention achieves "simultaneous collection of input data" other than by having numerous spotters around the golf course, as PGA TOUR had already been doing with its ShotLink system before plaintiff's priority date. *See* Ex. 1 at 7:34-38; Ex. 19, 2008 PGA TOUR Guide at 9-12. The alleged "real time" and "simultaneous" features are nothing more than using conventional handheld devices to communicate data over a conventional wireless network. *See also* Ex. 18 at 27:3-29:20.

The second problem with Dr. Valerdi's assertion regarding the alleged benefits of the invention is that he ignores the fact that PGA TOUR's ShotLink system predates the priority date of the patents. Prior art ShotLink was already a real-time golf data gathering, processing, and distributing system that used authorized personnel operating portable devices throughout the golf course to collect and transmit data about the golf ball over a wireless network on the golf course in real time after the ball was hit. *See*, *e.g.*, Ex. 19 at 8-6, 9-12 (explaining in 2008 "ShotLink is a revolutionary platform for **collecting and disseminating** scoring and statistical data **on every shot**

*by every player in real-time during every tournament round*… Current uses of ShotLink data include: … *[p]owering mobile.pgatour.com*, the PGA TOUR's wireless application for use on *PDAs and cell phones* … ShotLink was introduced during the *2001* Buick Classic [tournament]… The ShotLink data is collected by *volunteers utilizing a combination of handheld devices* and laser range finders.") (emphases added); https://www.youtube.com/watch?v=NN6QUzFcSW8 (describing and showing ShotLink system as of September 2009, including authorized personnel called walking scorers using handheld portable devices to collect data about golf shots in real time and transmit the data over a wireless MESH network to servers in a trailer at the golf course); Ex. 20 (describing PGA TOUR's 2004-2007 version of the TOURCast "application on PGATOUR.COM", winner of a "2005 Emmy Award": "How is SHOTLink data integrated into TOURCast? Once the shot information *is collected on the course*, it is *transmitted wirelessly* back to the SHOTLink truck onsite. From there, it … is transmitted back to the Data Center … and then into TOURCast *for users to follow all the action on their computers*. From collection to its display in TOURCast, the entire data transmission process takes just *seconds*.") (emphases added) Thus, the advantages that Dr. Valerdi ascribes to the asserted patents (filed for in 2011) by using spotters with handheld devices collecting and disseminating data in real time was already in the prior art.

Because the asserted claims are directed to the abstract idea of collecting, processing, and distributing information for display using conventional computer and network technology, and because there is no inventive concept added in the claim limitations, the asserted claims are invalid under 35 U.S.C. § 101.

### E.    The Claims Are Invalid For Failing To Meet The Written Description Requirement

Paragraph 1 of 35 U.S.C. **§** 112 requires that "[t]he specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full,

clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same." 35 U.S.C. § 112 ¶ 1. "The test for the sufficiency of the written description 'is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date.'" *Vasudevan Software v. MicroStrategy, Inc.,* 782 F.3d 671, 682 (Fed. Cir. 2015) (quoting *Ariad Pharm., Inc. v. Eli Lilly & Co.,* 598 F.3d 1336, 1351 (Fed. Cir. 2010) (*en banc*))*.* "[T]he test requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art." *Vasudevan,* 782 F.3d at 682 (citing *Ariad,* 598 F.3d at 1351). Whether the written description adequately supports a patent claim is a question of fact. *Id.* (citing *Ariad,* 598 F.3d at 1355). "A party must prove invalidity for lack of written description by clear and convincing evidence." *Id.*

The shared specification of the '832 and '552 patents lack any disclosure for several claim limitations found in the asserted claims.  Thus, the patents fail to convey to those skilled in the art that the inventor had possession of that claimed subject matter as of the filing date. *See Transperfect Glob., Inc. v. Matal*, 703 F. App'x 953, 963 (Fed. Cir. 2017) (affirming PTAB decision that patent was invalid because the specification provided no description of a browser plug-in performing translations of hyperlinked webpages); *Realtime Data, LLC v. Morgan Stanley,* 554 F. App'x 923, 937 (Fed. Cir. 2014) (affirming summary judgment of invalidity for lack of written description where patent "contain[ed] limited language and no descriptive content and hence fail[ed] to show that Realtime invented or had possession of content-based or content-dependent data decompression"); *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479-80 (Fed. Cir. 1998) (reversing the district court and holding claims invalid for lack of written

description where the specification did not support claims in which the location of recliner controls is other than on a console).

> 1. **'832 patent claims 9 and 14, '552 patent claim 18: "wherein the condition of the ball includes a location of the ball relative to the GPS survey"**

This claim limitation, found in three dependent claims in the asserted patents, was not part of the originally filed claims.  Instead, it was added in the middle of prosecution of the '832 patent. Ex. 13, Response to Office Action, August 5, 2013, at 3. Because there is no support for this limitation in the specification (or the originally filed claims), it was new matter when added. These claims are invalid for lack of written description.

Specifically, the specification does not disclose that the "condition of the ball includes a location of the ball relative to the GPS survey." Ex. 14, Knutson Invalidity Report ¶ 55. To the contrary, as detailed above in connection with noninfringement regarding "condition of the ball," the specification explicitly differentiates "condition of the ball" and "location of the ball" as distinct data items. *See* Ex. 1, '832 patent at 7:51-56 ("For example, the spotter can input information about the ***location, condition***, and 'lie' of a particular player's ball, the order of play of various players in the group, …."); *see also, id.* at 8:7-14 ("In some embodiments, the circuitry of the portable device used by the spotter is programmed to record and transmit various characteristics, such as but not limited to golfers appearance, golfers equipment, ***golfers ball general location, golfers ball GPS location, golfers ball condition***, golfers strokes as they occur, …"); *id*. at Fig. 11 (separately depicting condition of the ball ("Ball: Dirty" and "Ball: Clean") and ball location via arrows pointing to locations on a map of a golf hole).

Nowhere does the specification teach the illogical idea that the condition of the ball includes a location of the ball, let alone one "relative to the GPS survey." Notably, column 14,

lines 14-28 discloses using GPS technology to collect and record data from the golf course, but is completely silent on any bearing on the attribute of "condition of the ball":

> Using GPS technology, it is possible to collect and record relevant data pertaining to a particular golf course, ahead of time, to generate a coverage map of the golf course. This data can then be incorporated into the functions of the present gathering and broadcasting system to enable the patron to track the location of golfers around the golf course, based on the GPS information, using the handheld device. The handheld devices used by the spotters and the patrons may or may not be the same device with merely different programming. However, if they are the same device, the GPS capabilities of spotter's device would be enhanced for greater accuracy in locating the position of the ball of a player by incorporating additional hardware, which may be connected to the handheld device by wire or wirelessly.

*See* Ex. 1 at 14:14-28.

Because the patent's disclosure does not demonstrate that the inventor was in possession of "wherein the condition of the ball includes a location of the ball relative to the GPS survey" as part of his invention at the time he filed his patent application, claims 9 and 14 of the '832 patent and claim 18 of the '552 patent are invalid for lack of written description.

> **2.** **'832 patent claims 1, 5:** "the production module being configured to display transmitted input data such that the production module selectively distributes a portion of the transmitted input data to an external television network based on characteristics of displayed input data"; **'552 patent claim 1:** "the production module being configured to display distributed input data so as to selectively distribute at least a portion of the distributed input data to an external television network based on characteristics of displayed input data"; **'552 patent claim 13:** "the production module being configured to display distributed input data so as to selectively distribute a portion of the transmitted input data to an external television network based on characteristics of displayed input data"

The specification of the '832 and '552 patents lacks any disclosure that ***the production module*** is configured to selectively distribute a portion of the transmitted input data to an external television network based on characteristics of displayed input data. Rather, the specification

describes that **_a human being_** (and not the production module as required by the claims), such as a "network engineer and/or a member of the golf event broadcasting crew," decides "whether and/or when to transmit the input data from the input spotter module for instance recall for television (TV) production." *See* Ex. 1, '832 patent at 7:12-19.

Other portions of the specification confirm the lack of disclosure that the production module selectively distributes the transmitted input data based on characteristics of displayed input data. For example, column 6, lines 52-53, states that the production module "collects, processes, organizes, and distributes the information for display," but does not provide any explanation of what the processing or organization consists of. *See also* Ex. 14, Knutson Invalidity Report ¶ 52.

Thus, the asserted claims are invalid for lack of sufficient written description.

> 3. **'832 patent (claim 1) and '552 patent (claim 1):** "the first portable device being configured to **_present information_** regarding the location and distance of the selected player's ball relative to the map of the golf course in real time after the ball has been hit by the selected player"; **'832 patent (claims 5, 13):** "the first portable device being configured to **_present information_** regarding the location and distance of the player's ball relative to the map of the golf course in real time after the ball has been hit by the player"

If "to present" in these phrases is interpreted to mean "to display," an interpretation that Plaintiff embraces (Ex. 4, Valerdi Dep. at 53:12-17), these claims are not supported by the specification of the '832 and '552 patents. Specifically, while the specification states that the *second* portable device (*i.e.*, the patron's device) can receive a map and display information regarding location of the ball relative to a map, it does not disclose that the inventor possessed the idea of having the *first* (spotter's) portable device include the same functionality. *See* Ex. 1, '832 patent at 2:22-31 ("The sporting event can be a golf tournament, and the method can include recording geographical and/or topographical information of a golf course of the tournament to generate a GPS coverage map of the golf course, transmitting the GPS coverage map to the **_second_**

*portable device*, *and selectively displaying* graphical representations of golf ball locations relative to the golf course after the golf ball has been hit by a player of the golf tournament, based on the GPS coverage map and the location of the first portable device transmitted to the ***second portable device***.") (emphases added).

Without a supporting disclosure, a person of ordinary skill in the art would not be able to determine that the Plaintiff was in possession of this limitation. Ex. 14, Knutson Invalidity Report ¶¶50-51.

> 4.   **'832 patent claim 9 and '552 patent claim 5: "the first device is configured … to selectively display a GPS survey of the golf course"**

For the same reasons explained immediately above, the specification does not describe that the *first* device can display a GPS survey of the golf course. *Id*.

## V.   CONCLUSION

For the foregoing reasons, Defendant PGA TOUR respectfully requests that the Court grant it summary judgment of noninfringement and of invalidity.

Date: March 11, 2022

Respectfully submitted,

AKERMAN LLP
777 South Flagler Drive,
Suite 1100 West Tower
West Palm Beach, Florida 33401
Telephone: (561) 653-5000
Fax: (561) 659-6313

By: */s/ David Brafman*
David Brafman (Admitted *pro hac vice*)
david.brafman@akerman.com
Mark Passler (Admitted *pro hac vice*)
mark.passler@akerman.com

36

C. Bryce Benson
Texas Bar No. 24031736
bryce.benson@akerman.com
AKERMAN LLP
2001 Ross Avenue, Suite 3600
Dallas, Texas 75201
Telephone: (214) 720-4300
Fax: (214) 981-9339

*Attorneys for Defendant PGA TOUR, Inc.*

37

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2022, I electronically served the foregoing document on

all the following:

John H. Barr, Jr.
**Meade Neese & Barr LLP**
2118 Smith Street
Houston, Tecas 77002
jbarr@mnbllp.com

John A. Yates
B. Todd Patterson
**Patterson + Sheridan LLP**
24 Greenway Plaza, Suite 1600
Houston, Texas 77046
jyates@pattersonsheridan.com
tpatterson@pattersonsheridan.com
kcoleman@pattersosheridan.com

Abelino Reyna
**Patterson + Sheridan LLP**
900 Washington Ave., Suite 503
Waco, Texas 76701
areyna@pattersonsheridan.com

*Attorneys for Plaintiff Information Images, LLC*

By: */s/David Brafman*
    David Brafman