**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| **INFORMATION IMAGES, LLC,**<br>                    **Plaintiff,**<br><br>*v.*<br><br>**PGA TOUR, INC.,**<br>                         **Defendant.** | **6:20-cv-0268-ADA**<br><br>PUBLIC VERSION |

## <u>MEMORANDUM OPINION AND ORDER</u>

Came on for consideration this date is Defendant PGA TOUR, Inc.'s ("PGA TOUR")
Motion for Summary Judgment of Noninfringement and Invalidity Under Sections 101 and 112.
ECF No. 74 (the "Motion"). On March 25, 2022, Plaintiff Information Images, LLC ("Information
Images") filed a response (ECF No. 83), to which PGA TOUR replied on April 1, 2022. ECF No.
90. On May 13, 2022, the Court held a pretrial conference, in which the court orally granted the
Motion with regard to divided infringement. *See* ECF No. 122 at 80:21–81:1. The Court also sua
sponte granted the Motion as to Information Images' indirect infringement claim. *Id.* at 81:20. The
Court, however, reserved its judgment on the remaining issues in the Motion until a later date. *See
id.* at 81:2–5. After the Court concluded its pretrial conference, the Court requested supplemental
briefing from the parties on the applicability of the Federal Circuit's decision in *Travel Sentry, Inc.
v. Tropp*, 877 F.3d 1370, 1372 (Fed. Cir. 2017), to the issues of divided infringement presented in
the Motion. Information Images submitted its supplemental brief on September 12, 2022 (ECF No.
123), and PGA TOUR submitted its supplemental brief on September 26, 2022. ECF No. 124.

After careful consideration of the Motion, the parties' briefs, and the applicable law, the
Court **GRANTS** the Motion as to Information Images' claims of direct infringement of the
asserted method and system claims. Although PGA TOUR did not even move for summary

judgment of no indirect infringement in its motion or during oral argument (*see generally* ECF Nos. 74, 90, 121), because we find that there is no direct infringement, the Court **GRANTS** summary judgment as to Information Images' claims of indirect infringement. *See Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 917 (2014). Finally, because there is no direct or indirect infringement of the asserted claims, the Court **GRANTS** PGA TOUR summary judgment on Information Images' claims that it is entitled to damages from PGA TOUR's contract with IMG Arena, a European Company that licenses ShotLink data.

## I. BACKGROUND

Information Images is asserting U.S. Patent No. 9,806,832 (the "'832 Patent") and its continuation, Patent No. 10,270,552 (the "'552 Patent"). The perceived problem that the patents allegedly solve is that at "golf tournaments, it is difficult for spectators to get real-time information about the status [of] players who may be a great distance away from where the spectator is watching, or may not be visible at all." '832 Patent at 1:26–30; '552 Patent at 1:28–30. To address that problem, the patents disclose "systems and methods of gathering, processing, and broadcasting real-time information of the sporting event to portable devices carried by spectators of the sporting event." '832 Patent at 1:41–45. Consequently, the preambles of all four asserted independent claims (claims 1 and 5 of the '832 Patent and claims 1 and 13 of the '552 Patent) recite a system or method "of gathering, processing, and distributing information of a golf tournament over a wireless network." '832 Patent 15:19–20, 16:14–15; '552 Patent at 15:20–21, 16:49–50.

Three significant components of the alleged invention are:

(1) A portable device used by an authorized "spotter" to input data about the golf ball after it has been hit (the "gathering" of the information). The claims refer to this device as the "first portable device." *See, e.g.*, '832 Patent at cl. 1.

(2) A portable device used by patrons of the tournament to request and receive input data from the production module over the wireless network (the "distributing" of the information). The claims refer to this device as the "second portable device." *See, e.g.*, *id.*

(3) A "production module" (essentially a back-end computer server which includes a "processing module") that receives the input data from the first portable device over a wireless network and distributes it in response to queries (the "processing" of the information). *See, e.g.*, *id.*

These three components and their communication of data over the wireless network are depicted in an exemplary embodiment in Figure 32:



Fig. 32

'832 Patent at Fig. 32.

The first (spotter's) portable device, the second (patron's) portable device, and the production module with processing module are all required by each of the asserted independent claims. Information Images is asserting two independent system claims: claim 1 of the '832 Patent and claim 1 of the '552 patent. For example, asserted claim 1 from the '832 Patent states:

> 1. A system of gathering, processing, and distributing information of a golf tournament over a wireless network, comprising:
> a **first portable device** configured to be carried by a broadcast or other authorized **spotter** of the golf tournament, the spotter having special permitted access to a golf course of the golf tournament and to participants of the golf tournament, the first portable device including a map of the golf course, the first portable device being configured to **receive input data from the spotter** regarding status of a selected player's golf ball during the golf tournament in real time after the golf ball has been hit by the selected player on a current hole of the selected player, the first portable device being configured to present information regarding the location and distance of the selected player's ball relative to the map of the golf course in real time after the ball has been hit by the selected player, the input data including information pertaining to the lie and the condition of the golf ball being tracked by the spotter and the selected player's strokes as they occur, the first portable device being configured to transmit the input data over the wireless network in real time during the golf tournament;
> a **second portable device carried by a patron of the sporting event to receive transmitted input data over the wireless network**, and to **selectively display current statistics pertaining to the selected hole and graphical representations of the transmitted input data according to an input from the patron**, the second portable device comprising a memory with pre-programmed information stored therein, the pre-programmed information including endorsements of respective participants of the golf tournament by manufacturers of equipment used by the respective participants of the golf tournament; and
> a production module configured to receive transmitted input data over the wireless network simultaneously from a plurality of spotters covering various players of the golf tournament, the production module being configured to display transmitted input data such that the production module selectively distributes a portion of the transmitted input data to an external television network based on characteristics of displayed input data, the production module having a processing module connected between the production module and the wireless network, the processing

module configured to receive data requests over the wireless network simultaneously from a plurality of second portable devices and to distribute requested data to each second portable device over the wireless network based on received data requests from each second portable device, respectively.

'832 Patent at cl. 1 (emphasis added). Information Images is also asserting two independent method claims: claim 5 of the '832 Patent and claim 13 of the '552 patent. For example, claim 5 of the '832 Patent (reproduced below) is a corresponding method claim to Claim 1 above. Specifically, Asserted Claim 5 states the following:

5. A method of gathering, processing, and distributing information of a golf tournament over a wireless network, the method comprising:

providing a **first portable device** to be carried by a broadcast or other authorized **spotter** of the golf tournament, the first portable device including a map of the golf course, the spotter having special permitted access to a golf course of the golf tournament and to participants of the golf tournament;

**inputting data by the spotter to the first portable device** regarding status of a player's golf ball during the golf tournament in real time after the golf ball has been hit by the player on a current hole of the player, the first portable device being configured to present information regarding the location and distance of the player's ball relative to the map of the golf course in real time after the ball has been hit by the player, the input data including information pertaining to the lie and the condition of the golf ball being tracked by the spotter and the player's strokes as they occur;

transmitting input data over the wireless network to **a second portable device carried by a patron of the golf tournament in real time during the golf tournament**, the second portable device comprising a memory with pre-programmed information stored therein, the pre-programmed information including endorsements of respective participants of the golf tournament by manufacturers of equipment used by the respective participants of the golf tournament;

transmitting input data over the wireless network to a production module simultaneously from a plurality of spotters covering various players of the golf tournament, the production module being configured to display transmitted input data such that the production module selectively distributes a portion of the transmitted input data to an external television network based on characteristics of displayed input data, the production module having a processing module connected between the production module and the wireless

network, the processing module configured to receive data requests over the wireless network simultaneously from a plurality of second portable devices and to distribute requested data to each second portable device over the wireless network based on received data requests from each second portable device, respectively; and

selectively displaying graphical representations of the transmitted data on the second portable device according to inquiries of the patron.

'823 Patent at cl. 5.

Information Images accuses PGA TOUR's ShotLink System as infringing both of the asserted patents. *See, e.g.*, ECF No. 1 ¶ 28. ShotLink is PGA TOUR's system for capturing and determining information about golf shots during golf tournaments. ECF No. 74 at 6. A variety of equipment and personnel are used to determine and calculate data such as the path of the ball through the air, the speed of the ball during flight, and the location of the ball after it comes to rest. *See id.* That data is aggregated and then distributed for use by PGA TOUR's Digital Operations team as well as by third parties who have licensed the data. *Id.* According to the PGA TOUR, the PGA TOUR's Digital Operations team is responsible for creating the digital platforms that golf fans can use to interact with PGA TOUR electronically. *Id.* These platforms include PGA TOUR's website (www.pgatour.com) and PGA TOUR's mobile app for iPhones and Android devices. *Id.*

The public generally cannot access ShotLink. Yet one of the Digital Operations platforms is called TOURCast, which can be found on pgatour.com and within the PGA TOUR mobile app. *Id.* at 6–7. By using their computers or phones to access TOURCast, the public can view data that originated from ShotLink, such as by viewing shot trails showing the path of a golf shot. *Id.* at 7.

PGA TOUR has a contract with a company in Europe known as IMG Arena that includes a license to certain ShotLink data. *Id.* In connection with the contract, PGA TOUR sends IMG Arena data from the ShotLink system during golf tournaments. *Id.* IMG Arena is then permitted to use the data for its own business purposes, which relate to sports betting. *Id.*

Information Images alleges that PGA TOUR is infringing in two ways. *Id.* at 8. First, by using its ShotLink system to collect data at golf tournaments and then licensing and sending the data to IMG Arena. *Id.* Second, by the combination of using the ShotLink system with members of the public using their computers and phones to access PGA TOUR's website or PGA TOUR's mobile app to view the ShotLink data. *Id.*

## II. LEGAL STANDARD

### A.    Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014). A material fact is one that is likely to reasonably affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is not genuine if the trier of fact could not, after an examination of the record, rationally find for the non-moving party. *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). As a result, the burden of demonstrating that no genuine dispute of material fact exists lies with the party moving for summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once presented, a court must view the movant's evidence and all factual inferences from such evidence in a light most favorable to the party opposing summary judgment. *Impossible Elecs. Techniques v. Wackenhut Protective Sys., Inc.*, 669 F.2d 1026, 1031 (5th Cir. 1982). Accordingly, the simple fact that the court believes that the non-moving party will be unsuccessful at trial is insufficient reason to grant summary judgment in favor of the moving party. *Jones v. Geophysical Co.*, 669 F.2d 280, 283 (5th Cir. 1982). However, "[w]hen opposing parties tell two different stories, but one of which is blatantly contradicted by the record, so that no reasonable

jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

Once the court determines that the movant has presented sufficient evidence that no genuine dispute of material fact exists, the burden of production shifts to the party opposing summary judgment. *Matsushita*, 475 U.S. at 586. The non-moving party must demonstrate a genuinely disputed fact by citing to parts of materials in the record, such as affidavits, declarations, stipulations, admissions, interrogatory answers, or other materials; or by showing that the materials cited by the movant do not establish the absence of a genuine dispute. FED. R. CIV. P. 56(C)(1)(A)– (B). "Conclusory allegations unsupported by concrete and particular facts will not prevent an award of summary judgment." *Duffy v. Leading Edge Prods.*, 44 F.3d 308, 312 (5th Cir. 1995). Moreover, unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994). After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted. *See* FED. R. CIV. P. 56; *Matsushita*, 475 U.S. at 586.

### B. Divided Infringement

Direct infringement occurs when an entity "without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor." 35 U.S.C. § 271(a).

The Federal Circuit has held that, for method claims, direct infringement "occurs where all the steps of a claimed method are performed by or *attributable to a single entity*." *Akamai Tech., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015) (hereinafter *Akamai V*) (emphasis added). When the steps are performed by multiple entities, "a court must determine whether the acts of one are attributable to the other such that a single entity is responsible for the

infringement." *Id*. An entity is responsible for another's "performance of method steps in two sets of circumstances: (1) where that entity directs or controls others' performance, and (2) where the actors form a joint enterprise." *Id*. (numerals in original). Courts may find direct infringement "when an alleged infringer conditions participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and establishes the manner or timing of that performance." *Id*. at 1023. But to show that a joint enterprise exists, a plaintiff must prove four elements:

> (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to have a voice in the direction of the enterprise giving equal rights of control.

*Id*.

For there to be infringement of an apparatus claim by use, there needs to be a single party using all elements of the claimed system. *Centillion Data Sys. LLC v. Qwest Communications Int'l Inc.*, 631 F.3d 1279, 1284 (Fed. Cir. 2011); *see also Acceleration Bay LLC v. 2K Sports, Inc.*, 15 F.4th 1069, 1074 (Fed. Cir. 2021) (upholding the district court's finding that "making a system under § 271(a) requires a single entity to combine all the claim elements and that, if a customer, rather than an accused infringer, performs the final step to assemble the system, then the accused infringer has not infringed."). For purposes of infringement, use of the system requires a party to "control the system as a whole and obtain benefit from it." *Id.*

## C. **Indirect Infringement**

Section 271(b) of the Patent Act provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). To succeed on such a claim, the patentee must show that the accused infringer (1) knowingly induced direct infringement and (2) possessed "specific intent" to induce that infringement. *See MEMC Electr. Materials, Inc. v.*

*Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1378 (Fed. Cir. 2005). Induced infringement under § 271(b) can only arise if direct infringement under § 271(a) has occurred. *Limelight Networks*, 572 U.S. 915 at 917.

### III. ANALYSIS

Direct infringement under 35 U.S.C. § 271(a) occurs "where all steps of a claimed method are performed *or attributable* to a single entity." *Akamai V*, 797 F.3d at 1022. The concept of "divided" infringement,[1] also sometimes referred to as "joint" infringement,[2] relates to situations where more than one actor is involved in practicing claimed method steps but "the acts of one are attributable to the other such that a single entity is responsible for the infringement." *Id.*

Although "[a] patentee can usually structure a claim to capture infringement by a single party," *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1381 (Fed. Cir. 2007), PGA TOUR has moved for summary judgment, arguing that this Court can conclude as a matter of law that PGA TOUR does not infringe because claimed method steps its patrons indisputably perform cannot be attributed to PGA TOUR. PGA TOUR has also moved for summary judgment as to the asserted system claims, arguing that PGA TOUR itself does not put the accused system into service because it does not control its patrons' devices. The method and system issues are, in the Court's view, related; the Court grants summary judgment as to both types of claims. And because the Court finds no direct infringement, the Court finds that as a matter of law PGA TOUR cannot indirectly infringe the asserted claims. Similarly, because there is no direct or indirect infringement of the asserted claims, PGA TOUR is also entitled to summary judgment on Information Images'

---

[1] *See Mankes v. Vivid Seats Ltd.*, 822 F.3d 1302, 1304 (Fed. Cir. 2016) (referring to "divided infringement"); *BMC*, 498 F.3d at 1380–81 (same).
[2] *See Lyda v. CBS Corp.*, 838 F.3d 1331, 1338 (Fed. Cir. 2016) (referring to "joint infringement"); *Muniauction*, 532 F.3d at 1328–29 (same).

claims that it is entitled to damages from PGA TOUR's contract with IMG Arena, a European Company that licenses ShotLink data.

### A.  Method Claims

Claim 5 of the '832 patent is directed to a method of "gathering, processing, and distributing information" that includes steps like: having a "spotter" input data "regarding status of a player's golf ball during the golf tournament in real time" into a "first portable device"; "transmitting input data over the wireless network to a second portable device carried by a patron of the golf tournament in real time"; and "selectively displaying graphical representations of the transmitted data on the second portable device according to inquiries of the patron." '832 patent at 16:15–64. Claim 13 of the '552 patent generally requires these same steps with modifications immaterial to this Court's analysis of the divided infringement issue. *See* '552 patent at 16:49–17:29.

PGA TOUR contends it cannot infringe because it does not perform the "selectively displaying graphical representations of the transmitted data on the second portable device according to inquiries of the patron" step. ECF No. 74 at 15–17. Information Images identifies the "second portable device" in the accused system as a smartphone, laptop, or other portable device that a member of the public uses to view data originating from ShotLink through (a) accessing PGA TOUR's website; or (b) running Information Images' mobile app. *See id.* at 13; ECF No. 75-2, Valerdi Dep. at 61:23–63:4 (examples of the "second portable device" include a user's/patron's Apple iPhone or laptop computer, such as Information Images' expert's own iPhone). PGA TOUR argues it is not the PGA TOUR that performs the "selectively displaying" step but instead "the patron"—a member of the public owning and operating the accused second portable device. PGA TOUR concludes that, because it does not perform that "selectively displaying" step, it cannot infringe. ECF No. 74 at 16. Though Information Images never argues that the PGA TOUR

performs the "selectively displaying" step, it contends that step may nevertheless be attributed to the PGA TOUR. ECF No. 83 at 12.

Information Images does not justify attributing the "selectively displaying" step to PGA TOUR based on an agency relationship or some contractual responsibility between PGA TOUR and its patrons. *See generally id.* Instead, it relies on what has been referred to as "*Akamai V*'s two-prong test." *See Travel Sentry*, 877 F.3d at 1380. *Akamai V*'s first prong considers whether the "alleged infringer conditions participation in an activity or receipt of a benefit upon performance of" the method step or steps it does not itself perform. 797 F.3d at 1023. The second prong considers whether the alleged infringer "establishes the manner or timing of that performance." *Id.* The Federal Circuit recently described one "common thread" connecting its opinions applying *Akamai V* to find a properly articulated divided infringement: "evidence that a third party hoping to obtain access to certain benefits can only do so if it performs certain steps identified by the defendant, and does so under the terms prescribed by the defendant." *Travel Sentry*, 877 F.3d at 1380.

### 1. PGA TOUR Does Not Condition a Benefit of Patrons Performing Method Steps

At the first prong, Information Images must show that PGA TOUR offered its customers a benefit or access to an activity but conditioned receipt of that benefit/access on the customer performing the "selectively displaying" step. *See Akamai V*, 797 F.3d at 1023. Consistent with the framework provided in *Travel Sentry*, 877 F.3d at 1381, the Court (a) must first characterize the relevant benefit or activity PGA TOUR offered its patrons (b) before moving to consider whether PGA TOUR conditions access to the activity or benefit on performing the "selectively displaying" step.

a.      Characterizing the Benefit/Activity

In its supplemental briefing addressing *Travel Sentry*, Information Images clarifies what it considers to be relevant benefit or activity here. *See* ECF No. 123 at 1–3. **First**, Information Images defines the relevant **<u>activity</u>** as "selectively displaying graphical representations of the transmitted data on the second portable device according to inquiries" of the patron. *Id.* at 2. This is an activity that is different from what Information Images previously identified. Indeed, in its original briefing it contended that the relevant activity was "use of a second portable device." *See* ECF No. 83 at 10, 12. **Second**, Information Images contends that the PGA TOUR "conditions a patron's receipt of the **<u>benefit</u>** <u>free access to real-time interactive golf tournament related information, status, and results,</u> on the patron's performance of inputting inquiries into the PGATour.com app or TOURCast platform on the second portable device in the manner specified by PGA TOUR, for example through the buttons on the TOURCast platform allows a patron to inquire about certain players and holes on the course." ECF No. 123 at 3 (emphasis in original).

In response, PGA TOUR acknowledges the discrepancies between the activity/benefit of Information Images' original briefing and its supplemental briefing. *See* ECF No. 124 at 1–2. **First**, PGA TOUR first contends that Information Images' new arguments regarding activity are incorrect. *Id.* at 1. PGA TOUR argues the relevant activity here is "obtaining golf tournament data from PGA TOUR" because "PGA TOUR provides third party users of its website and mobile app with PGA TOUR-collected golf tournament data." *Id.* at 2. **Second,** with respect to the benefit portion of the *Akamai V* test, the PGA TOUR asserts the benefit provided to third parties here "is the ability to receive tournament-related information without having to observe the underlying golf event." *Id.* PGA TOUR contends that Information Images' alleged benefit, "free access to real-time interactive golf tournament related information, status, and results," is "overly specific

13

because it does not always flow from obtaining PGA TOUR golf tournament data." *Id.* According to PGA TOUR, "[r]eal-time tournament information is available, but so is historical information – whether from an hour ago or from a decade ago." *Id.* Likewise, PGA TOUR argues that its "app and website provides golf tournament information not just interactively but also noninteractively, such as tournament information presented on the home page of pgatour.com, as well as information automatically sent to PGA TOUR mobile app users as a Notification, without the user making an inquiry." *Id.*

The Court finds that the thorny issue here is defining the relevant activity. In *Travel Sentry*, the Federal Circuit held that the district court "erred by defining the relevant activity in an unduly broad manner." 877 F.3d at 1381. The Court therefore must be cognizant not to define the relevant activity too broadly or without explanation. *See id.* Thus, the Court finds that a review of how the Federal Circuit in *Travel Sentry* came to its relevant activity would be helpful here.

In *Travel Sentry*, the defendant, Travel Sentry, was accused of infringing patents directed to methods of improving airline luggage inspection through the use of dual-access locks. 877 F.3d at 1372. Travel Sentry had entered a memorandum of understanding ("MOU") with the Transportation Safety Administration ("TSA"), providing that "Travel Sentry will supply TSA with master keys (termed 'passkeys') to open checked baggage secured with" Travel Sentry's certified locks. *Id.* at 1373. The MOU "is the **only** written agreement between TSA and Travel Sentry concerning Travel Sentry certified locks." *Id.* There was seemingly no dispute that it was the TSA, not Travel Sentry, that performed the final two steps of the claimed methods: identifying luggage with a special lock that screening entity had passkeys to; and, pursuant to an agreement, unlocking the special lock using a passkey to allow access into the luggage. At prong one of the *Akamai V* test, the Federal Circuit rejected the trial court's characterization of the relevant activity

as "luggage screening" generally. *Id.* at 1381. Rather, the panel read the MOU to provide a more specific activity: "screening luggage that TSA knows can be opened with the passkeys provided by Travel Sentry." *Id.*

As can be seen above in *Travel Sentry*, the Federal Circuit relied heavily on the MOU in order to formulate its relevant activity. Here, by contrast, there is no specific written agreement between the PGA TOUR and the end users. Although Information Images asserts that users of PGA TOUR's mobile app and website enter into an end user license agreement ("EULA") "that requires patrons to use and operate the PGA TOUR app and TOURCast platform in a manner consistent with the EULA, Terms of Service, and Privacy Policy" (ECF No. 123 at 4–5), Information Images' only evidence of an agreement is the text of the EULA filed as Ex. M at ECF No. 83. But, as will also be discussed below, Information Images points to nothing in the EULA that establishes the manner and timing of the user's performance of the method steps at issue. Reading the EULA confirms that nothing in it requires or instructs users to perform any actions required by the patent claims or tells them how or when to do so. *See* ECF No. 83 at Ex. M. In direct contrast, in *Travel Sentry*, the MOU delineated how TSA was to use the passkeys and open locks. 877 F.3d at 84.

The Court finds that neither party's activity to be on point. PGA TOUR offers a somewhat broad, but accurate, characterization of the relevant activity: "obtaining golf tournament data from PGA TOUR." By contrast, Information Images requires a very narrow construction of the relevant activity: "selectively displaying graphical representations of the transmitted data on the second portable device according to inquiries." Unlike the plaintiff in *Travel Sentry*, Information Images does not tie any of this language to the EULA—the only purported agreement between the end users and the PGA TOUR here. Rather, Information Images merely copies the direct language of

the method claims: "selectively displaying graphical representations of the transmitted data on the second portable device according to inquiries of the patron." *See* '832 Patent at cl. 5. The Court finds that PGA TOUR's relevant activity aligns closer with the analysis of *Travel Sentry* than Information Image's relevant activity. In *Akamai V*, defendant Akamai provided a content delivery network for use by the third-party customers. Thus, the relevant activity for the divided infringement analysis was "**use of** [Akamai]'s content delivery network." *Akamai V*, 797 F.3d at 1024 (emphasis added). Similarly, in *Travel Sentry*, the defendant provided the TSA with a passkey-based system that enabled the TSA to screen luggage compatible with its passkeys. Thus, the relevant activity was "**screening luggage** that TSA knows can be opened with the passkeys provided by Travel Sentry." 877 F.3d at 1381 (emphasis added). Analogously, PGA TOUR provides third party users of its website and mobile app with PGA TOUR-collected golf tournament data. Yet the relevant activity here is not merely "obtaining golf tournament data from PGA TOUR"—as PGA TOUR suggests—because that is not sufficiently tied to the activity at issue. Instead, the Court finds that the relevant activity here is "**displaying graphical representations of ShotLink data on a portable device**."

As to the relevant benefit, Information Images contends that it is "free access to real-time interactive golf tournament related information, status, and results." By contrast, PGA TOUR contends that it "is the ability to receive tournament-related information without having to observe the underlying golf event." The Court finds both benefit definitions incorrect. There is nothing in the record that requires the benefit being conveyed here be "free" as Information Images contends. Likewise, there is nothing in the record that supports PGA TOUR's contention that the benefit is receiving ShotLink data "without having to observe the underlying golf event." With respect to the "benefit" portion of prong one of the *Akamai V* test, the benefit provided to the TSA in *Travel*

*Sentry* was the ability to open identifiable luggage using a master key, preventing the need to break open the lock, among other benefits flowing therefrom. *See Travel Sentry*, 877 F.3d at 1382. Analogously, the main benefit to third-party users here is **access to ShotLink data on a portable device**. Although Information Images contends that the information should be in "real time," that does not always flow from the relevant activity here—"displaying graphical representations of ShotLink data on a portable device." Real-time tournament information is available, but so is historical information—whether from an hour ago or from a decade ago. *See* ECF No. 124 at 2.

   b.  Receipt of the Benefit Was Not Conditioned on the Claimed Steps

   Could a reasonable jury conclude that PGA TOUR conditioned the activity or benefit on third parties performing a step of the patented method, namely making data inquiries on a portable device? *See* ECF No. 74 at Ex. 1 at cl. 5 ("… to distribute requested data to each second portable device over the wireless network based on received data requests from each second portable device"; "selectively displaying graphical representations of the transmitted data on the second portable device according to inquiries of the patron."). As explained below, the Court finds that the answer is ***no***. There are numerous ways for the public to participate in the relevant activity and receive the relevant benefit without having to perform the claimed method steps.

   To reiterate, the Court found above that the relevant activity to be: "displaying graphical representations of ShotLink data on a portable device." And the Court found that the relevant benefit to be is "access to ShotLink Data on a portable device." PGA TOUR explains that "the public can obtain PGA TOUR tournament data by watching the tournament on TV broadcasts, which include displays of graphical representations of real-time PGA TOUR golf tournament information, status, and results without the need to make any inquiry." ECF No. 124 at 3. Critically, opening PGA TOUR's website or mobile app provides the user with real-time golf tournament

information, status, and results on the homepage without the need to submit any inquiry. *Id.* Users with the PGA TOUR mobile app on their phone can also receive automatic real-time notifications containing golf tournament related information, status, and results from PGA TOUR, again without the need to make an inquiry. *Id.*

That the third parties can obtain golf tournament information from PGA TOUR and receive the accompanying benefits without performing the patent's method steps is a critical distinction from *Travel Sentry*. The Federal Circuit explained there that the "common thread" of the divided infringement caselaw finding liability was "that a third party hoping to obtain access to certain benefits can only do so if it performs certain steps identified by the defendant, and does so under the terms prescribed by the defendant." 877 F.3d at 1380. Indeed, in *Travel Sentry*, "whatever benefits flow to TSA from identifying luggage with Travel Sentry's dual-access locks and from opening these locks with the passkeys that Travel Sentry provided can only be realized if TSA performs the final two claim steps." *Id.* at 1382–83 (emphasis added). Likewise, in *Akamai V*, customers were permitted to use Akamai's content delivery network only if they performed the tagging and serving steps required by the patent claim. *Akamai V*, 797 F.3d at 1025; *see also Eli Lilly & Co. v. Teva Parenteral Medicines*, 845 F.3d 1357, 1366 (Fed. Cir. 2017) (patients were given the chemotherapy treatment at issue by their doctors only if they performed the pre-treatment steps found in the patent claim). In each of those cases, if the third party failed to perform the steps in the claim that were not performed by the defendant itself, the third party was denied the defendant's product or service and its resulting benefits.

In contrast, the third-party members of the public can obtain PGA TOUR's golf tournament data without performing the method steps at issue because the patented method requires the public to make data inquiries on a second portable device. PGA TOUR has not conditioned participation

in the activity, or receipt of the benefit, on making inquiries on a portable device; the numerous other options listed above are available, such as using pgatour.com or watching a live broadcast on a portable device. The Court therefore finds that PGA TOUR is entitled to summary judgment on the asserted method claims. *See ESW Holdings, Inc. v. Roku, Inc.*, No. 6-19-CV-00044-ADA, 2021 WL 1069047, at *4 (W.D. Tex. Mar. 18, 2021) (holding no genuine issue of material fact and granting summary judgment upon finding that "users may enjoy the accused feature without performing the method steps at issue"); *NeuroGrafix v. Brainlab, Inc.*, 2020 WL 5642946, at *18 (N.D. Ill. Sept. 21, 2020) ("Stated differently, [the plaintiffs] have not presented evidence that the only way to use the [software] to create DTI images is by performing at least one of the steps of claim.").

   2. <u>Even if PGA TOUR Satisfied *Akamai V* Prong One, PGA TOUR Does Not Control the Manner and Time</u>

  Even though the Court found above that summary judgment should be granted as to Information Images' asserted method claims because they fail prong one of the *Akamai V* two-part test, the Court will now consider whether Information Images would have satisfied prong two were the Court to have adopted Information Images' relevant activity and benefit and found that PGA TOUR conditioned receiving them on performance of the method steps. As explained below, the Court finds that PGA TOUR does not control the manner and time of performance. Drawing a comparison to the MOU agreement between Travel Sentry and the TSA, Information Images asserts that users of PGA TOUR's mobile app and website enter into an EULA "that requires patrons to use and operate the PGA TOUR app and TOURCast platform in a manner consistent with the EULA, Terms of Service, and Privacy Policy." *See* ECF No. 123 at 5. Information Images' only evidence is the text of the EULA filed as Ex. M at ECF No. 83. The Court finds this fails to raise a genuine issue of material fact.

The EULA merely states the following:

> "This Device Application [EULA] sets forth the **terms and conditions for your use of any PGA TOUR Device Application**. By using a PGA TOUR Device Application, you agree to be bound by this agreement. **If you cannot or do not agree to comply with this Agreement, then you may not use any PGA TOUR Device Application**. … [I]n addition to the terms of this [EULA], you acknowledge and agree that your use of the PGA TOUR Device Application is also subject to: (a) the Terms of Service for the www. Pgatour.com website … and (b) the PGATOUR.com Privacy Policy"

ECF No. 83 at Ex. M. (emphasis added).

First, Information Images provides no factual (or legal) support for its assertion that users of PGA TOUR's website enter into that agreement. Second, Information Images points to nothing in the EULA that establishes the manner and timing of the user's performance of the method steps at issue. The Court finds that reading the EULA confirms that nothing in it requires or instructs users to perform any actions required by the patent claims or tells them how or when to do so. *See* ECF No. 83 at Ex. M; *Midwest Athletics & Sports All. v. Ricoh USA*, No. 2:19-CV-00514, 2021 WL 3722329, at *9 (E.D. Pa. Aug. 23, 2021) ("[T]he user manuals, software fixes, and license agreement on which [plaintiff] relies are general in nature, and none of them instructs—much less directs or controls—[defendant's] customers to perform each and every method of Claim 1"). In direct contrast, in *Travel Sentry*, the MOU delineated how TSA was to use the passkeys and open locks. 877 F.3d at 84. Finally, users are free to make data inquiries whenever they want, whether it is immediately after a golf play, or years later. Thus, both the manner and timing of "selectively displaying graphical representations of the transmitted data on the second portable device according to inquiries" is entirely up to the users and is not dictated by PGA TOUR. Information Images has not pointed to any evidence raising a genuine issue of material fact otherwise. For at least these reasons, the Court finds that a reasonable jury could not find that the PGA TOUR

establishes the manner or timing of that performance even if the Court adopted Information

Images' activity/benefit under prong one of *Akamai V*.

### 3. PGA TOUR Does Not Induce Infringement

Because induced infringement under § 271(b) can only arise if direct infringement under §

271(a) has occurred, *Limelight Networks*, 572 U.S. 915 at 917, the Court finds that PGA TOUR

cannot induce the infringement of the third parties who use the second portable devices under the

asserted method claims.

### B. System Claims

Claim 1 of the '832 patent recites:

> 1. A system of gathering, processing, and distributing information
> of a golf tournament over a wireless network, comprising:
>
> a first portable device configured to be carried by a broadcast or
> other authorized spotter of the golf tournament, . . . the first portable
> device being configured to receive input data from the spotter
> regarding status of a selected player's golf ball during the golf
> tournament in real time after the golf ball has been hit by the selected
> player on a current hole of the selected player, the first portable
> device being configured to present information regarding the
> location and distance of the selected player's ball relative to the map
> of the golf course in real time after the ball has been hit by the
> selected player, . . .
>
> a second portable device carried by a patron of the sporting event to
> receive transmitted input data over the wireless network, and to
> selectively display current statistics pertaining to the selected hole
> and graphical representations of the transmitted input data according
> to an input from the patron, the second portable device comprising
> a memory with pre-programmed information stored therein, . . . ;
> and
>
> a production module configured to receive transmitted input data
> over the wireless network simultaneously from a plurality of
> spotters covering various players of the golf tournament, the
> production module being configured to display transmitted input
> data such that the production module selectively distributes a
> portion of the transmitted input data to an external television
> network based on characteristics of displayed input data, the

production module having a processing module connected between the production module and the wireless network, the processing module configured to receive data requests over the wireless network simultaneously from a plurality of second portable devices and to distribute requested data to each second portable device over the wireless network based on received data requests from each second portable device, respectively.

'832 patent at 15:19–16:4.

Claim 1 of the '552 patent recites:

1. A system of gathering, processing, and distributing information of a golf tournament over a wireless network, comprising:

a first portable device configured to be carried by a spotter of the golf tournament, the spotter having special permitted access to a golf course of the golf tournament and to participants of the golf tournament, the first portable device including a map of the golf course, the first portable device being configured to receive input data from the spotter regarding status of a selected player's golf ball during the golf tournament in real time after the golf ball has been hit by the selected player on a current hole of the selected player, the first portable device being configured to present information regarding the location and distance of the selected player's ball relative to the map of the golf course in real time after the ball has been hit by the selected player, the input data including information pertaining to the lie and the condition of the golf ball being tracked by the spotter and the selected player's strokes as they occur, the first portable device being configured to distribute the input data over the wireless network in real time during the golf tournament;

a second portable device carried by a user viewing the golf tournament to receive distributed input data over the wireless network, and to selectively display current statistics pertaining to the selected hole and graphical representations of the distributed input data according to an input from the user, the second portable device being configured to display pre-programmed information provided to the second portable device including endorsement information of manufacturers of equipment used by the respective participants of the golf tournament; and

a production module configured to receive distributed input data over the wireless network simultaneously from a plurality of spotters covering various players of the golf tournament, the production module being configured to display distributed input data so as to selectively distribute at least a portion of the distributed

22

> input data to an external television network based on characteristics of displayed input data, the production module having a processing module connected between the production module and the wireless network, the processing module being configured to receive data requests over the wireless network simultaneously from a plurality of second portable devices and to distribute requested data to each second portable device over the wireless network based on received data requests from each second portable device, respectively.

'552 patent at 15:20–16:3.

PGA TOUR contends it cannot infringe because it does not put the claimed "second portable device" into use. ECF No. 74 at 13–15. Information Images identifies the "second portable device" in the accused system as a smartphone, laptop, or other portable device that a member of the public uses to view data originating from ShotLink through (a) accessing PGA TOUR's website; or (b) running PGA TOUR's mobile app. ECF No. 13 at 13; ECF No. 75-2, Valerdi Dep. at 61:23–63:4 (examples of the "second portable device" include a user's/patron's Apple iPhone or laptop computer, such as Information Images' expert's own iPhone). PGA TOUR argues it is not the PGA TOUR but instead a member of the public owning and operating the accused second portable device that puts the second portable device into use. PGA TOUR concludes that, because it does not use the second portable device, it cannot infringe. ECF No. 74 at 13 (citing *Centillion*, 631 F.3d at 1284). Information Images disagrees, arguing that PGA TOUR is "the single party controlling and benefiting from all elements of the ShotLink/TOURCast system, including the 'second portable device.'" ECF No. 83 at 11.

The Federal Circuit holds that "direct infringement by 'use' of a system claim requires a party to use each and every element of a claimed [system]." *Centillion*, 631 F.3d at 1284 (cleaned up). In this Court's view, it can accomplish that in one of at least two ways. The first is through "traditional" use, in which the accused infringer puts the entire accused system into service. The second is through divided infringement, wherein more than one actor is involved in using the

claimed system components but the use of one actor is attributable to the other such that a single entity is responsible for the infringement.

      1.    <u>PGA TOUR Does Not "Use" the Accused System</u>

The Federal Circuit holds that "to 'use' a system for purposes of infringement, a party must put the invention into service." *Centillion*, 631 F.3d at 1284 (citing *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282 (Fed. Cir. 2005)). "In order to 'put the system into service,' the end user must be using all portions of the claimed invention." *Id.* To "put the system into service" the accused infringer must "control the system as a whole and obtain benefit from it." *Id.* (citing *NTP*, 418 F.3d at 1282). Yet the requisite control need not be "physical" or "direct" control over each individual element of the system. *See id.*

The *Centillion* opinion is a guide for divining the necessary "control" of an accused system running software on a front- and back-end. In *Centillion*, the Federal Circuit considered asserted system claims and determined that the defendant, Qwest, did not exercise sufficient control over the accused system despite owning and operating all the back-end components. Yet Qwest's customers, who only bring the front-end hardware, *did* exercise sufficient control. The accused system included two parts: Qwest's back-end systems and front-end client applications that Qwest's customers could install on their personal computer. *Centillion*, 631 F.3d at 1281. The accused products provided two different modes of operations. First, Qwest offered an "on-demand" operation in which a customer could create a query with "particular and specified information" that the Qwest back-end system processes to provide a result for the customer to download. *Id.* at 1285. Second, Qwest offered a "standard" operation in which, after a customer subscribes to receive monthly summary reports, Qwest's back-end systems automatically creates summary reports every month that the customer may download. *Id.*

The *Centillion* panel determined that the customer controls the system and obtains a benefit from it in the on-demand operation:

> The customer controls the system by creating a query and transmitting it to Qwest's back-end. . . . This query causes the back-end processing to act for its intended purpose to run a query and return a result. The user may then download the result and perform additional processing as required by the claim. If the user did not make the request, then the back-end processing would not be put into service. . . . It makes no difference that the back-end processing is physically possessed by Qwest.

*Id.*

It reached the same conclusion for the standard operation:

> By subscribing a single time, the user causes the back-end processing to perform its function on a monthly basis. Like the on-demand operation, the back-end processing in normal operation is performed in response to a customer demand. The difference though is that a single customer demand (the act of subscribing to the service) causes the back-end processing monthly. But in both modes of operation, it is the customer initiated demand for the service which causes the back-end system to generate the requisite reports. This is "use" because, but for the customer's actions, the entire system would never have been put into service. This is sufficient control over the system . . . and the customer clearly benefits from this function.

*Id.*

The *Centillion* panel rejected the theory that Qwest itself controls the system and obtains benefit from it. The discussion was brief: "While Qwest may make the back-end processing elements, it never 'uses' the entire claimed system because it never puts into service the personal computer data processing means. Supplying the software for the customer to use is not the same as using the system." *Id.* at 1286.

*Centillion*'s effects in the software space are slowly percolating through district courts. For example, in *Acceleration Bay*, the U.S. District Court for the District of Delaware concluded that a defendant, Activision, did not "use" the accused system where Activision's customers installed

and executed Activision's software on the customer's own computer. 324 F. Supp. 3d at 483–84. The asserted claims were directed to "networks" or "channels" made up of "participants" and "connections" between "participants." *Id.* at 479. The plaintiff's experts agreed that "participants" are ultimately "application programs"—namely, video games—executing on Activision's customers' computers. *Id.* at 480. It was undisputed that "the customer must install Activision's software" on a computer, "execute it, and choose an online, multiplayer game mode with more than 5 other participants to make and use the accused networks." *Id.* at 481. Invoking *Centillion*, the *Acceleration Bay* court determined that Activision's "exclusive ownership and control of the game software" did not "put the invention into service." *Id.* at 482. Activision never used the entire claimed system because "[n]o claimed system can be put into service until multiple [Activision] customers install the software and 'execut[e] [it] on the client computers.'" *Id.*

In *Free Stream Media Corp. v. Alphonso Inc.*, the U.S. District Court for the Northern District of California concluded that the defendant, Alphonso, did not "use" the accused system where Alphonso had supplied nothing to the end users whose devices must act to put the whole system in use. 366 F. Supp. 3d 1093, 1103 (N.D. Cal. 2018), *rev'd on other grounds*, 996 F.3d 1355 (Fed. Cir. 2021). The asserted claims were directed to "[a] relevancy-matching server communicatively coupled with a television and a mobile device through a network," in which "the relevancy-matching server is to cause a rendering of the targeted data to the user through the sandboxed application of the mobile device." *Id.* at 1097. The "targeted data" of the accused system was targeted advertising and the "mobile device" was, for example, a member of the public's phone. The accused system operated such that the phone would send a bid request to a third party's servers and that third party would then solicit bids from advertisers; the winning bidder would have their targeted advertisement transmitted for display on the phone. The accused

infringer was merely an advertisement broker submitting bids to the third party; the accused infringer did not "supply software installed on the mobile device that submits bid requests and has no contracts with any mobile device maker or mobile device user." *Id.* at 1099. The *Free Stream* court concluded that Alphonso could not "use" the accused system because "one absolutely essential element remains entirely outside [Alphonse's] control": the phone's issuance of a bid request. *Id.* at 1103. "Alphonso has nothing to do with the phone software or any of the conditions under which phones issue such requests." *Id.* And the claimed "targeted data"/targeted advertising would "never be delivered to a consumer's phone unless and until that phone issues a bid request." *Id.* Therefore, under *Centillion*, Alphonso did not put the accused system into use.

This Court finds itself in accord with the *Centillion* and *Acceleration Bay* opinions in concluding that PGA TOUR, though owning and operating the back-end components, does not put the accused system into service because it does not control the accused front-end components. In *Centillion*, the accused infringer's customers put the accused system into service by initiating, on the front-end components, a demand for service that caused back-end components to act out their intended purpose: running a query and returning a result. 631 F.3d at 1285. Accordingly, the accused infringer did not control the accused system—the customers did. *Id.* Likewise, PGA TOUR does not control the accused system because PGA TOUR's patrons put the accused system into service by initiating, on the "second portable device," a demand for service that causes back-end components, like the "production module," to act out their intended purpose.

More specifically, PGA TOUR's patrons put portions of the accused system into service by initiating, on their phones or laptops, a demand for service. The Asserted System Claims require a "second portable device" that "selectively display[s] current statistics pertaining to the selected hole and graphical representations of the transmitted input data *according to an input from the*

27

*patron*." *See, e.g.*, '832 patent at 15:43–48 (emphasis added); '552 patent at 15:43–48 (reciting materially identical element). They also require a "processing module," a back-end component, configured "to receive *data requests* over the wireless network simultaneously from a plurality of second portable devices." '832 patent at 15:65–67; '552 patent at 15:64–66. The patron's input on the second portable device/the second portable device's requests for data constitute a demand for service. It is the patron's input[3] that causes the processing module, a back-end component, to act out an intended purpose: distributing "requested data to each second portable device over the wireless network based on received data requests from each second portable device." '832 patent at 16:1–4; '552 patent at 15:67–16:3.

PGA TOUR patrons, therefore, control this portion of the accused system—not the PGA TOUR. It cannot be said that the PGA TOUR initiates a demand for service from patron devices causing those devices to act out their intended purpose. The demand goes the other direction, towards the entity offering up its back-end components for service. The PGA TOUR thus does not put the patron devices into service. And, as in *Centillion*, it is of no moment that PGA TOUR supplies "the software for the customer to use." *See* 631 F.3d at 1286.

Information Images disagrees, alleging that "PGA controls the content of the pgatour.com, the PGA TOUR App and TourCast platform that displays ShotLink data on the 'second portable device.'" ECF No. 83 at 10. For this proposition, Information Images reproduces deposition testimony from PGA TOUR personnel in which they state that PGA TOUR operates TOURCast and controls the ShotLink system. *Id.* Also excerpted is testimony from PGA TOUR personnel that data driving the PGA TOUR App and TOURCast comes from ShotLink. *Id.* The PGA TOUR

---

[3] When using the PGA Tour Mobile Application at a PGA golf event, Information Images' expert, Dr. Valerdi, observed "data requests sent via the application as [he] navigated the application." ECF No. 83-2 at 65.

does not dispute these contentions. ECF No. 90 at 4. Information Images' arguments are, in this Court's judgment, unavailing. In *Centillion*, Qwest controlled the content—electronic billing data—eventually displayed on its customers' computers, yet Qwest did not, in the Federal Circuit judgment, "use" the accused system because it did not control its customers' computers. To be sure, Qwest's customers could tailor the content Qwest sent for display on the customers' computer. *Centillion*, 631 F.3d at 1285 (explaining how, in the on-demand operation, customers could "seek[] particular and specific information"). PGA TOUR patrons likewise tailor what information they see. After all, the Asserted System Claims require that the "second portable device" "selectively display current statistics pertaining to the selected hole and graphical representations of the transmitted input data *according to an input from the patron*." '832 patent at 15:43–48 (emphasis added); '552 patent at 15:43–48 (reciting materially identical element).; *see also* '832 patent at 16:1–4 (requiring the processing module to distribute "requested data to each second portable device over the wireless network *based on received data requests from each second portable device*" (emphasis added); '552 patent at 15:67–16:3 (same).

### 2.    PGA TOUR Patrons' "Use" Cannot Be Attributed to PGA TOUR

In *Centillion*, the Federal Circuit concluded, as this Court does here, that the accused infringer has not committed infringement through traditional "use" because the accused infringer has not put the entire accused system into service. Yet this Court, like the *Centillion* court, will not end its analysis there. The *Centillion* panel went on to consider whether it could attribute Qwest's customers' use of the front-end components to Qwest under a "vicarious liability" theory. *Centillion*, 631 F.3d at 1286. In doing so, the court heavily cited divided infringement caselaw restricted to the method-claim context. *Id.* (first citing *BMC*, 498 F.3d at 1373, then citing *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318 (Fed. Cir. 2008), and then citing *Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293 (Fed. Cir. 2005)). The *Centillion* court

concluded there was no vicarious liability because "Qwest in no way directs its customers to perform nor do its customers act as its agents." 631 F.3d at 1287 ("While Qwest provides software and technical assistance, it is entirely the decision of the customer whether to install and operate this software on its personal computer data processing means.").

The Court views *Centillion* as endorsing the theory that divided infringement as a concept applies to infringement through the "use" of system claims just as it applies to method claims. *Centillion* supposes that vicarious liability may be used to attribute a customer's use of a claimed component to the accused service provider. And the *Centillion* court separated its vicarious-liability analysis from its analysis as to whether Qwest put the entire system into service. The *en banc* Federal Circuit's *Akamai V* opinion then clarified and expanded how to attribute one entity's conduct to another using vicarious liability principles.[4] It did not, as far as this Court can tell, overturn *Centillion*[5] or its application of principles of attribution. Accordingly, the Court finds it only appropriate to apply the *Akamai V* two-prong test in this context as well.[6]

---

[4] The *Akamai V* court clarified, however, that unnamed previous opinions used the term "vicarious liability" loosely. 97 F.3d at 1022 n.2. "In the context of joint patent infringement, an alleged infringer is not liable for a third party's commission of infringement—rather, an alleged infringer is responsible for method steps performed by a third party." *Id.*

[5] *See, e.g.*, *United Servs. Auto. Ass'n v. Wells Fargo Bank, N.A.*, No. 2:18-CV-00366-JRG-RSP, 2019 U.S. Dist. LEXIS 217004, at *5 (E.D. Tex. Dec. 17, 2019) ("The Court finds that even in light of *Akamai*, *Centillion* continues to be the appropriate standard under which to analyze infringement of system claims."); *CenTrak, Inc. v. Sonitor Techs., Inc.*, Civ. Action No. 14-183-RGA, 2017 U.S. Dist. LEXIS 139277, at *16 (D. Del. Aug. 30, 2017) ("There is no indication that *Centillion* has been overruled or that its holding is no longer good law.").

[6] To be sure, *Lyda v. CBS Corp.* opined that "[o]ur cases have applied joint infringement to method claims and not system claims." 838 F.3d 1331, 1339 (Fed. Cir. 2016). Yet the *Lyda* panel cannot overturn the *Centillion* opinion or its application of divided-infringement principles to system claims. *See Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed. Cir. 1988) ("This Court has adopted the rule that prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned [*e*]*n banc*.").

The result of the *Akamai V* two-prong test in the context of the Asserted System Claims is the same as it was in the context of the Asserted Method Claims, laid out above. The Court is persuaded that there is not a genuine dispute of material fact that PGA TOUR conditions the receipt of a benefit—access to ShotLink data on a portable device—on its patrons' use as part of the accused system. Accordingly, the Court will GRANT PGA TOUR's motion for summary judgment.

### 3. Information Images Cannot Rely On Its Own Second Portable Devices

Information Images argues that the PGA TOUR does put the entire accused system into service when it provides its patrons, at on-site hospitality tents, a second portable device containing a "hospitality app." ECF No. 83 at 11.

The PGA TOUR clarifies that the "hospitality app" is software called "Tournament Tracker" that Information Images' final infringement contentions do not accuse, and that Information Images' expert's infringement report does not include in its lists of "Accused Products." ECF No. 90 at 5. Moreover, the PGA TOUR alleges that "none of the damages that Plaintiff is seeking relate to use of the hospitality app in the hospitality tents." ECF No. 90 at 5. Thus, the Court finds that the hospitality app in the hospitality tents cannot save Information Images' claim from summary judgment because Information Images' final infringement contentions do not accuse it and Information Images has provided no expert analysis.

### 4. PGA TOUR Does Not Induce Infringement

Because induced infringement under § 271(b) can only arise if direct infringement under § 271(a) has occurred, *Limelight Networks*, 572 U.S. 915 at 917, the Court finds that PGA TOUR cannot induce the infringement of the third parties who use the second portable devices under the Asserted System Claims.

**C.      PGA TOUR's Actions In Fulfilling Its Contractual Obligations To IMG Arena Are Noninfringing As A Matter Of Law**

Information Images is seeking a reasonable royalty on the fees that PGA TOUR receives under a contract with IMG Arena. Information Images, however, admits that this is not an infringement theory that it is asserting in this case. *See* ECF No. 83 at 2 ("the Court can deny this aspect of the motion because it is about damages, not infringement"). Because the Court finds that PGA TOUR is entitled to summary judgment of noninfringement as explained above (and therefore no damages), the Court finds that PGA TOUR is also entitled to summary judgment of noninfringement in connection with any allegation of infringement with the IMG Arena contract.

## IV. CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that PGA TOUR's Motion for Summary Judgment, ECF No. 74, is **GRANTED**.

SIGNED this 2nd day of August, 2023.

_____
ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE